## LIABILITY UNDER INDEMNITY BOND FOR LOSS THROUGH BANK CASHIER.

Common Pleas Court of Lorain County.

GEORGE T. CUTTS, RECEIVER, v. A. B. SPEAR ET AL.

Decided, May 7, 1909.

*Fidelity Insurance—Bond Covering Honesty of Bank Cashier—Misappropriation of Funds of Bank by—Equivalent to Embezzlement or Larceny by—Contract is Continuous—And Renewal of Bond Extends Indemnity from Year to Year.*

1. "Fraud or dishonesty" of a bank cashier "amounting to embezzlement or larceny," for which a fidelity and guaranty company promises "to make good and reimburse," comprehends such dishonest and fraudulent conduct resulting in loss as is equivalent to embezzlement or larceny, and is not confined to the technical offenses mentioned or such misappropriation of funds as would subject the cashier to a conviction for embezzlement or larceny.
2. An indemnity bond promising "during the term" of one year for which it is executed, "or any subsequent renewal of such term," to reimburse and make good fraudulent and dishonest transactions and losses by a bank cashier, "committed during the continuance of said term, or any renewal thereof, and discovered during said continuance or renewal thereof or within six months thereafter," is a continuous contract extending the indemnity from year to year, as distinguished from separate and distinct contracts for each year, and covers a misappropriation or fraud committed during the first year of the contract of indemnity but not discovered until six months after the bond had been renewed.

*Squire, Sanders & Dempsey* and *E. G., H. C. and T. C. Johnson*, for plaintiff.

*Carr, Stearns, Chamberlain & Royon* and *G. H. Chamberlain*, for defendant, United States Fidelity & Guaranty Co.    .

WASHBURN, J.

On motion for new trial.

Plaintiff, as receiver, representing the Citizens National Bank of Oberlin, Ohio, sued the defendants, A. B. Spear and the United States Fidelity & Guaranty Co., on a bond given by them to said bank in which said bonding company guaranteed the fidelity of the cashier of said bank. The term of the bond was from February 5, 1903, to February 5, 1904, and was continued in force by a renewal certificate from February 5, 1904, to February 5, 1905. The cashier, A. B. Spear, and the president of the bank had certain dealings with C. L. Chadwick, otherwise known as Cassie Chadwick, between February 5, 1903, and December 1, 1904, in which the bank lost more than $150,000, practically all of said transactions occurring during the first year covered by said bond and none of them being discovered within six months after the expiration of said first year. Some of the directors of the bank learned as early as October, 1904, that said Chadwick had obtained at least $150,000 of the bank's funds by means of alleged loans which the cashier and president had made to said Chadwick and which they represented to have been made in good faith and upon what they supposed was good security, and that said security was then doubtful and later proved to be worthless.

The three or four directors who had this information, and the cashier and president kept the matter secret from the other directors and made a vain attempt to collect the notes given by said Chadwick until the bank failed, the first Monday in December, 1904.

When the bank failed all of the directors learned that these overloans had been made and that the security was probably worthless, but there was no evidence tending to show that anyone except the cashier and president, who were parties to the conspiracy, if there was one, knew that the books of the bank had

been juggled, or that any conspiracy existed, or that the transactions with said Chadwick were fraudulent or dishonest so far as the cashier was concerned, except that at the meeting of the directors just before the bank failed the cashier, on being questioned, said that said loans had been made for the benefit of himself and the president of the bank, and not for the benefit of the bank.

A receiver took charge of the affairs of the bank at once and early in January, 1905, notified the defendant bonding company that said transactions of Spear, the cashier, were dishonest and fraudulent within the terms of said bond, and claimed that the bonding company was liable to the bank for $15,000, the amount of said bond, and in February, 1905, filed proof of loss; and later, and within the time limit of said bond, this suit was begun.

The claim was also made that said Spear, during the first yearly term of said bond, in September, 1903, appropriated to his own use $20,000 of the funds of said bank.

During the trial evidence was introduced tending to prove that when these loans were made a conspiracy existed between said Chadwick and the cashier and president of said bank, and that the cashier and president personally profited thereby, and that the transactions were not regularly entered upon the books of the bank as legitimate transactions should have been, and that from time to time false entries were made, and that the books were juggled for the purpose of concealing said transactions.

The trial resulted in a verdict for the full amount of the bond and interest, and this matter is now before the court on a motion for new trial.

Two propositions only will be considered in this opinion: first, whether the transactions complained of were such as were covered by the terms of said bond, and, second, whether they were discovered within the time limited for their discovery by the terms of said bond.

The terms of the bond, so far as these questions are concerned, are as follows:

"The company shall, during the term above mentioned, or any subsequent renewal of such term    *    *    *    make good and reimburse to the said employer, such pecuniary loss as may be

sustained by the employer by reason of the fraud or dishonesty of said employe in connection with the duties of his office or position, *amounting to embezzlement or larceny,* and which shall have been committed during the continuance of said term, or any renewal thereof, and *discovered during said continuance or any renewal thereof or within six months thereafter,* * * * the company's total liability on account of said employe under this bond or any renewal thereof, not to exceed the sum of $15,-000.''

The claim made in the petition was that said bank had suffered a pecuniary loss in the sum of $150,500 by reason of the fraud and dishonesty of A. B. Spear in connection with the duties of his office and position as cashier of said bank, amounting to embezzlement or larceny, in that said A. B. Spear conspired with, aided and assisted one C. L. Chadwick in fraudulently obtaining from the bank on certain dates certain sums of money by certifying as good, checks offered by said Chadwick on said bank and by issuing to said Chadwick drafts on the New York depository of said bank, payable to the order of said Chadwick, when, as a matter of fact, said Chadwick had no funds in said bank and the bank was not indebted to her in any way or in any sums whatever, nor had the directors or officers of said bank authorized Spear to loan said Chadwick the sums aforesaid or any part thereof, all of which was well known to said A. B. Spear and said C. L. Chadwick at the time; and it was further claimed that said Spear on or about September 28, 1903, unlawfully and without any right so to do, appropriated to his own use the sum of $20,000, being the property of said bank.

The claim of the defendant is that unless such transactions constituted technical embezzlement or larceny they were not covered by the terms of said bond and that the petition failed to charge embezzlement or larceny and the proof failed to establish either.

Passing the question of whether or not the proof established technical embezzlement or larceny, let us consider what was meant by the parties when in making said contract they used the language ''fraud or dishonesty of said employe amounting to embezzlement or larceny.'' If only technical embezzlement or larceny was meant, then the expression ''fraud or dishonesty

amounting to," was entirely superfluous, and such a construction must necessarily give no force and effect to those words. In my judgment the language of the bond meant more than just technical embezzlement or larceny; it meant such dishonest and fraudulent conduct resulting in loss as was "equivalent" to embezzlement or larceny.

Was there at the time this contract was made a species of fraud and dishonesty more or less common among cashiers which, while not technically embezzlement or larceny, "amounted" to the same thing? If there was, isn't that what was meant by the above expression, which would otherwise be meaningless? Misapplication of the funds of national banks by cashiers, under circumstances where it was impossible to convict them of embezzlement or larceny, occurred so frequently that Congress was led to amend the embezzlement and larceny statute so as to make misapplication of the funds of a bank amount, so far as penalty was concerned, to the same thing as embezzlement or larceny. See U. S. Stats., Section 5209.

There can be no question that the transactions of Spear, if willfully fraudulent or dishonest, constituted a misapplication of the funds of the bank, and that I understand to be conceded by counsel for defendant, and, in my judgment, was fraud and dishonesty amounting to embezzlement or larceny within the meaning and contemplation of the parties when said contract was made. This view is strengthened by a consideration of the object of the contract and the well settled rules of construction applicable thereto. It was a contract of indemnity and should be reasonably construed so as to give effect to the express words, and all the express words, if possible, of the parties, and not defeat their intention, and "if the policy is open to two interpretations which are equally fair, that one should be preferred which would give to the insured the greater indemnity." *German Ins. Co.* v. *Schild*, 69 Ohio St., 136; *West* v. *Insurance Co.*, 27 Ohio St., 1.

"Being contracts of indemnity against loss such contracts should be liberally construed in favor of the object sought to be attained; and when a clause is susceptible of two interpretations which seem equally fair, that should be preferred which affords

the greater indemnity, but like other contracts they should receive a reasonable construction in order to carry out the presumed intention of the parties as expressed by the language used." *Livington* v. *Fidelity & Dep. Co.,* 76 Ohio St., 253, 264.

A surety on a bond like this "is regarded as an insurer, whose contract, being drawn by the surety himself and for a money consideration, is, if ambiguity exists in the language, to be resolved most strongly against the surety." *Bryant* v. *Bonding Co.,* 77 Ohio St., 90, 99.

For some other authorities along the same line, outside of the state of Ohio, see *Booth* v. *Commonwealth,* 113 S. W. Rep., 61 (Ky.); *French* v. *Fidelity & C. Co.,* 115 N. W. Rep., 869 (Wis.); *Cook* v. *Benefit League,* 76 Min., 382; *Travelers Ins. Co. of Hartford* v. *Murray,* 16 Col., 296 (25 Am. St. Rep., 267); *Arnold* v. *Insurance Co.,* 3 Ga., 685; *Insurance Co. of N. A.* v. *De Loach,* 3 Ga. App., 807; *Royal Union Life Ins. Co.* v. *McLendon,* 62 S. E. Rep., 101 (Ga.); *Hatch* v. *Casualty Co.,* 197 Mass., 101; *Cutting* v. *Insurance Co.,* 85 N. E. Rep., 174-5 (Mass.); *Dresser* v. *Insurance Co.,* 70 Atl. Rep., 39 (Conn.); *American Surety Co.* v. *Pauly,* 170 U. S., 133; *Title Guar. & Sur. Co.* v. *Bank,* 117 S. W. Rep., 537 (Ark.).

It may be claimed that if the cashier entered into a conspiracy with said Chadwick to defraud said bank, and in carrying out such conspiracy they did do that which constituted larceny of the funds of the bank on the part of said Chadwick, then it would be larceny on the part of the cashier, but under the foregoing rules of construction it is my judgment that the bond covered the acts of the cashier even though they were not such as to subject him to a conviction for larceny, provided they were such as were equivalent to embezzlement or larceny. *City Trust, Safe Dep. & Sur. Co.* v. *Lee,* 204 Ill., 69; *Champion Ice Mfg. & C. S. Co.* v. *Bonding & Tr. Co.,* 115 Ky., 863 (103 Am. St. Rep., 356); *American Bond & Tr. Co.* v. *Harvester Co.,* 91 Md., 733; *Frost, Guar. & Sur.,* 117; 19 Cyc., 518.

In view of the terms of this contract and the foregoing rules of construction, I do not think that this court erred when it charged the jury as follows:

"As I have said, the claim is that there was a conspiracy between the said Spear and the said Chadwick whereby said Chadwick was to unlawfully obtain the money of said bank, when both said Spear and said Chadwick knew that the bank was not indebted to said Chadwick and knew also that neither the officers or directors of said bank had authorized said Spear to loan or to pay to said Chadwick any sums whatever, and that the design of said Spear and said Chadwick was to defraud said bank.

"Was there such a conspiracy? Did they, designing to defraud said bank, agree to do those things which would enable said Chadwick by means of unlawful and fictitious transactions to obtain the funds of said bank and appropriate them to her or their use, when Spear had no right to pay or loan the funds of the bank to her? If so, then there was a conspiracy which, if resulting in loss to the bank, would amount to larceny or embezzlement within the terms of said bond. Or were the transactions mere'y loans, which, although unauthorized, were made in good faith, without profit to said Spear and with no intention to defraud the bank? If so, then there was no such conspiracy which, although loss resulted to said bank, would amount to larceny or embezzlement within the terms of said bond. An agreement merely to loan and actually loaning in good faith to said Chadwick a greater amount than the bank was authorized to loan to one person, would not be a transaction covered by the terms of said bond.

"Under the bond in question the defendant bonding company would not be liable for any mere error of judgment or *bona fide* mistake, or any injudicious exercise of discretion on the part of said Spear in and about all or any of the matters wherein he had been vested with discretion by said bank, either by instructions or by the rules and regulations of said bank. The gist of the matter is a design to defraud the bank, and if said Spear and Chadwick had that common design and each performed a part necessary to carry that design into execution, and the result of that design and the carrying of it into execution was a loss to the bank, and an appropriation of the funds of the bank to the use of the conspirators, it would be covered by the bond, even though a large part of the funds procured from said bank in carrying out said design was appropriated to the use of said Chadwick and not to the use of said Spear."

The jury was also charged in reference to the claim that Spear had appropriated to his own use $20,000 of the funds of the bank.

The next question is as to the time within which the fraud

or dishonesty must have been discovered in order to hold the defendant liable on said bond, the claim of the defendant being that a fraud committed during the first year of the contract must have been discovered during that year or within six months thereafter and immediately reported to the company, and if not discovered within that time that the company would not be liable under said bond although the bond was continued in force at the time of such discovery.

The language of the bond is that the company shall "during the term above mentioned or any subsequent renewal thereof" make good the loss suffered "during the continuance of said term, or of any renewal thereof, and discovered during said continuance or any renewal thereof, or within six months thereafter." The renewal certificate by its terms "continued" said bond in force for another year, as was contemplated should be done and was provided for by the terms of said bond. The bond also contained a provision whereby the company could put an end to the contract on giving a month's notice in writing.

Giving to the language used by the parties in making their contract its ordinary, common-sense meaning, it seems plain that they contemplated and intended a contract which would probably be continued from year to year, and if it was so continued that it should be one contract, with but one penalty, and they used apt and appropriate language to express that intention. What, then, did they mean by the provision that the fraud resulting in loss should be discovered during the continuance of said original term "or any renewal thereof, or within six months thereafter?" In view of the fact that liability under the bond is limited to one penalty no matter how many times renewed or how long continued, the above language, when fairly construed, plainly expresses an intention to make the bond cover all loss discovered during the time the bond was in force or within six months thereafter. If we are to construe the contract fairly, but when in doubt, so as to "afford the greater indemnity" and "most strongly against the surety," how can the language of the parties be held to mean that a fraud resulting in loss during the first year must be discovered during that year or within six months thereafter? If such was the intention of the parties it

would have been very easy to have used language plainly expressing such intention; certainly language which apparently expresses the opposite intention can not be so construed without violating the rules of construction heretofore mentioned.

But the construction claimed by the defendant is required, it is said, because each renewal constitutes a separate contract. That is not true, except in a limited sense. All the terms of the contract, except that for its continuance in force after the first year, were carefully provided for, so that it would be a new contract only in reference to time; as to all other matters it was merely to be continued in force. The renewal certificate which was issued by the defendant provided that the contract was "continued" in force, but no additional penalty was provided for; the "renewal" was a new contract only in the sense of extending the indemnity of the original bond to another year, but there really was but one bond, with one penalty.

If within two months after the bond was renewed it had been discovered that the employe had embezzled during the first year more than the amount of the penalty of the bond, and also after the renewal he had embezzled more than the amount of the penalty of the bond, there could be but one recovery under the terms of the bond. If the original contract and the renewal thereof constituted separate contracts, then under such circumstances there should be two recoveries, as two were paid for by the insured, but the bond binds the defendant fidelity company to pay but one penalty, which negatives the idea of two separate contracts.

Taking into consideration all of the provisions of this bond and interpreting it according to the rules heretofore referred to, I am of the opinion that it was the intention of the parties to enter into a contract which when renewed should be continuous, and not two contracts, and that a loss insured against, which was discovered while the contract was in force or within six months thereafter, would be covered by the bond. *First Nat. Bank* v. *Fidelity & Guar. Co.*, 110 Tenn., 10 (100 Am. St. Rep., 765); see also, *United States Fidelity & Guar. Co.* v. *Bank*, 233 Ill., 475; *Fidelity & Deposit Co.* v. *Ice Mfg. & C. S. Co.*, 117 S. W. Rep., 393 (Ky.). Such was the ruling at the trial. A *contra* holding may be found in *De Jernette* v. *Fidelity & Cas. Co.*, 98

Ky., 558, but the bond in that case contained certain provisions that are not found in the bond now under consideration. That bond contained this provision:

"Any claim made under this bond or any renewal thereof shall embrace and cover only acts committed during its currency, and within twelve months next before the date of the discovery of the act or default upon which such claim is based."

In the renewal receipt there was used language as follows:

"The contract under bond No. 53,939 is hereby renewed in accordance with the terms of the bond, the guaranty to cover the period above named only."

It thus appeared that it was the intention of the parties to treat the renewal as a separate contract, and that the protection afforded by the renewal should be limited to the terms of the renewal. These provisions distinguish that case from the case at bar, and are quoted and relied upon by the court in arriving at the conclusion that each renewal constituted a separate contract. It will be noticed, also, that the contract was "renewed" and not "continued," as in the case at bar.

A like result was reached in a case decided by the Supreme Court of Georgia in 1902 (*Mayor of Brunswick* v. *Harvey,* 114 Ga., 733), but the bond in that case contained a provision that upon the issuance by the company of any subsequent bond guaranteeing the fidelity of the treasurer, the liability under the original bond should cease and determine, so that no two bonds should be operative at the same time. It will be noted, also, in that case that an attempt was made by amendments to treat the renewals as separate contracts and recover the full penalty upon each of the renewals. It was held that under the provisions of that particular bond it was terminated by the subsequent renewals and the latter were, in fact, new and distinct contracts which adopted by reference all the terms and conditions of the first bond, and there being a provision in the bond that liability under the original bond should cease and determine upon the giving of a new bond so that no two bonds should be operative at the same time, the company was not held liable under the original bond for a

loss not discovered until more than six months after the expiration of such original bond.

The provision as to a new bond plainly referred to renewals and there the parties used language indicating that they intended that the renewals should be treated as new bonds, that is, as separate and distinct contracts.

The absence of such a provision in the case at bar and the continuance of the original bond instead of a renewal of the same, renders the terms of the bond at least ambiguous and subject to the rules of construction heretofore referred to.

Then there is a case, *Proctor Coal Co.* v. *Fidelity & Guar. Co.*, 124 Fed. Rep., 424, in which the United States Circuit Court for the Northern District of Georgia held that the renewals did not operate as a continuing contract, but that each renewal was a separate and distinct obligation. But among the provisions of that bond was a provision which declared that on the issuance of a subsequent bond *or renewal* responsibility on any other bond should cease; it being the intention that only the last bond should be in force at any one time. In that case the court determined that "the original bond and each renewal stand for the malfeasance of the employe during the continuance of each and discovery within six months after the termination of each."

It may be that such conclusion might have been reached had not that provision been in the bond, but it seems that to reach such a conclusion where the bond does not contain such provision is merely construing the bond in favor of the insurance company and in accordance with what might be considered its intention without taking into consideration the purpose and intention of the insured.

It appears that the defendant bonding company in the case at bar was the defendant in the case last above referred to, and it may be that the above provision was omitted from the bond in question because the company thought that it was unnecessary. It is evident that the insertion of it would tend to reveal to applicants the company's intention to limit its liability on the original bond to losses discovered within six months after the expiration thereof and thereby be likely to deter them from making such contracts. Considering the omission of that provision or any

provision which would plainly reveal such to be its intention, the court is not justified in declaring that such was its intention when the language used indicates an opposite intention. If the language "discovered during said continuance or any renewal thereof or within six months thereafter" is susceptible of a double meaning, then it is susceptible of two interpretations which seem equally fair, and in that event it should receive that construction which affords the greater indemnity.

Irrespective of authorities, it is my opinion that the language used in this bond does not make it plain that the parties intended that the loss should be discovered within the limits claimed by the defendant, but on the contrary that the insured at least intended and was justified in expecting that the insurer would make good a loss discovered at any time the bond was in force either as an original bond or as a continuance of the same, and that therefore an ambiguity existed which should be resolved most strongly against the surety. There being no adjudications in Ohio which govern the court in the determination of this question, I have concluded to follow my own convictions of what this contract ought to be construed to mean under the rules of construction laid down by our Supreme Court.

The question of when the discovery was made and whether timely and proper notice was given in accordance with the terms of the bond, were peculiarly jury questions, and were submitted and determined in favor of the plaintiff.

The motion for new trial will be overruled.

The defendant, the United States Fidelity & Guaranty Co., excepts.