## Thomas v. Commonwealth.

(Decided June 28, 1922.)

### Appeal from Harlan Circuit Court.

1. Homicide—Impeachment of Witness—Evidence.—On the trial of the appellant a statement of his son, an adult, made immediately after the shooting of the deceased by the appellant, to the effect that the latter shot deceased in shooting at him (the witness) and that he (the witness) then shot at appellant, was properly allowed to be proven by the several witnesses introduced in rebuttal by the Commonwealth for that purpose, as the son in previously testifying on behalf of the appellant had, on cross-examination, denied making the statement to the witnesses referred to. The evidence in question was competent to discredit the son as a witness and contradict the testimony given by him in chief on behalf of appellant, and the jury were carefully admonished by the trial court to consider it for that purpose alone.

2. Homicide—Dying Declarations.—The statement of the deceased, made immediately after he was shot by the appellant and repeated before his death several hours later: "That Bill Thomas (the appellant's son) was the person his father (the appellant) tried to kill; that he had to die in Bill's place; and that he had his hand up begging Jim Thomas (appellant) not to kill Bill when he shot him (deceased)," was properly admitted by the trial court as evidence because competent as a dying declaration, as it was made to appear from what he knew of the fatal character of his wounds, what he said of his expectation of an early death, and the surrounding circumstances, that it was made by the deceased under a consciousness of impending death and without hope of this life.

3. Homicide—Dying Declarations.—The exclusion by the trial court of the testimony of the witness, Fee, as to certain declarations claimed to have been made by appellant's wife to the deceased and Bill

Thomas shortly bfore the homicide, looking to the prevention of a difficulty between them and appellant, was not error. Such declarations of the wife, proven through another, were no more competent as evidence in the appellant's behalf than would have been her own sworn statements as a witness; for the wife cannot testify for the husband, or the husband for the wife.

4. Homicide—Defense of Home—Instructions.—Instructions must be predicated upon the facts furnished by the evidence in the case; therefore to authorize the giving of an instruction by the trial court advising the jury in a case of homicide of the law regarding the right of the defendant to defend his home from invasion by the deceased, there must be evidence requiring or justifying such instruction. As in this case, according to the appellant's evidence, it was injury to his person and not to his home or its inmates that he claimed to fear when he shot the deceased, the failure of the court to give an instruction as to his right to defend his home was not error. The jury were correctly instructed as to the law of self-defense as well as on all other features of the case; hence were advised of all the law ncessary to their guidance in arriving at a verdict.

LYTTLE & MORGAN for appellant.

CHAS. I. DAWSON, Attorney General, and THOS. B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellant, J. F. Thomas, seeks by this appeal the reversal of a judgment entered upon a verdict by which he was found guilty of the crime of murder and his punishment fixed at confinement in the penitentiary for life. The grounds upon which he moved for and was refused a new trial in the court below, are now relied on for the reversal of the judgment of conviction; the several rulings and matters occurring in that court, assigned as error, being as follows: (1) Admission of incompetent and prejudicial evidence. (2) Refusal of an instruction respecting the right of the appellant to defend his habitation. (3) Failure to instruct the jury upon the whole law of the case. (4) That the verdict of the jury is not sustained by the evidence.

Briefly stated, the facts respecting the crime charged and the appellant's connection with its commission, appear from the bill of evidence to be as follows: Walter McCoy, the person killed, was a nephew of the appellant, and having been left an orphan in childhood, had partly been reared by the uncle, with whom he was residing at the time of his (McCoy's) marriage, which oc-

curred about fifteen years before his death. In the fore-
noon of the day of the homicide, deceased, the appellant,
Jim Fee, and Will Thomas, a son of the appellant
(called in the record "Bill" Thomas), were together
near Evarts, a mining village, with liquor in their pos-
session of which they partook in such quantity that all of
them soon became intoxicated. It does not appear from
the evidence what occurred while they were near Evarts,
but some kind of an altercation between Bill Thomas
and some other member of the party must have arisen
there, for the appellant and McCoy left that place and
went to the home of the latter nearby for the purpose,
as they announced after their arrival there, of conceal-
ing or removing from the reach of Bill Thomas a shot
gun and two pistols owned by McCoy. One of the pistols
McCoy, after firing a bullet from it into the floor of his
house, put in his pocket, the other he placed in a trunk
which he locked; the shot gun was taken by appellant.
While they were at McCoy's home the appellant ap-
peared to suddenly become angry with the latter and
began to curse and threaten him, saying, among other
things: "Walter, God damn your crazy soul, I am go-
ing to kill you," to which McCoy made no reply. They
then left McCoy's residence together, McCoy in posses-
sion of the pistol and appellant the shot gun, and both
going in the direction of the latter's residence but a few
hundred yards distant and like that of McCoy situated
on Bailey's creek. Before arriving at appellant's
residence, however, they stopped at the mouth of a coal
mine and got into a conversation with Stacy, Sargent
and Shackelford, all of whom testified that appellant ap-
peared to be in an ill humor with McCoy about some-
thing that occurred at the latter's home; that McCoy, in
attempting some explanation of appellant's anger to-
ward him, laid his hand on and partly raised from his
pocket a pistol, seeing which act, the appellant, who was
still carrying the shot gun, commanded McCoy to take
his hand from the pistol, and McCoy thereupon said to
appellant, whom he addressed as uncle Jim, that he was
partly pulling and raising the pistol from his pocket to
prevent it from being concealed, and, in addition, re-
marked to the appellant: "As many times as I have
picked you up out of the slums and kept you from get-
ting hurt, you ought to be ashamed of talking to me this
way." At that juncture Stacy and his companions told
appellant and McCoy to go home and not get into trou-

ble, to which the appellant replied that "he would take care of himself if the shot gun lasted." Upon thus ending the conversation appellant and McCoy proceeded on their way to the appellant's home where, after entering the house, he sat down on the bed with the shot gun in his lap. About that time Jim Fee and the appellant's son, Bill Thomas, entered the house and the latter at once attempted to take from his father the shot gun, in which he seems to have been assisted by Fee and McCoy; and in the struggle over the possession of the weapon all four of the parties fell to the floor, but they did not succeed in wresting the gun from appellant.

The evidence as to what occurred down to the happening of this event, was unconflicting, but with respect to what followed much of it was conflicting. The appellant and his witnesses Bill Thomas and Jim Fee, then present, testified, in substance, that the appellant upon getting up from the floor left the house by one door and McCoy, after firing one shot from his pistol in the house, left by another, walked out of the yard accompanied by Bill Thomas and later turned, facing the appellant, who was standing in front of the house, at whom he fired one shot with the pistol he was carrying, the bullet from which struck the latter's leg and inflicted a slight wound; and that instantly following this shot, the appellant fired both barrels of the shot gun at McCoy, the shot entering his body from head to knees. The shooting occurred about 1:30 p. m., and McCoy died from the wounds at 10 a. m. the next day.

On the other hand, before the introduction of the evidence for the appellant referred to, the Commonwealth had introduced in chief five witnesses, four of whom resided or were near the appellant's residence when the shooting was done and heard the reports of all shots fired, but none of whom heard the report of a gun or pistol that was or could have been fired by McCoy in the appellant's house as claimed by him and his witnesses. On the contrary, the five witnesses for the Commonwealth all testified that but three shots were fired, all being in the open, with the two first heard so close together that the second must instantaneously have followed the first, and that the third came after a brief interval following these two. K. M. Jones, one of these witnesses, testified that he was in his barn not more than fifty yards from the place of the shooting when it occurred, and that but three shots were fired, the first two being from a shot gun, practi-

cally as if both barrels had gone off together, and the third, immediately following, being from a pistol. Jones also testified that upon hearing the shooting he looked to where it took place and saw Bill Thomas with a pistol in his hand trying to assist McCoy to his feet, and that the latter's face was bloody. Jones then went to them and upon reaching them saw the appellant walking a plank that crossed the creek and he was then in possession of a shot gun.

Another of the five witnesses referred to, Estill Mc-Coy, a thirteen year old son of the deceased, testified that he saw the shooting of his father by the appellant, being at the time on his way home from the Spring Branch Store with some articles obtained there for his mother; and that upon getting near the appellant's home, he saw him standing in front of his house with a double barreled shot gun in his hand, McCoy and Bill Thomas being at the time about fifty yards in front of him standing behind a tree; that McCoy stepped from behind the tree facing the appellant and the latter then fired both barrels of the shot gun at him, one shot immediately following the other and both taking effect, causing McCoy to fall to the ground. The witness further testified that the shooting done by the appellant was immediately returned by Bill Thomas, who fired at him a single shot from a pistol, but that no shooting was done by McCoy. Though the witness quickly reached the place of the shooting, it is not clear from the evidence whether he did so before or after the arrival there of the witness. Jones; at any rate he did not hear all that was said between the latter and McCoy and Bill Thomas, as, by the advice of Jones, he soon left the ground to obtain a physician for the wounded man. To Jones, however, McCoy in the presence of Bill Thomas stated, in substance, that Bill was the person the appellant tried to kill, that he (McCoy) had to die in Bill's place; and that he had his hand up begging Jim Thomas (appellant) not to kill Bill when he shot him. It also appears from the testimony of Jones that Bill Thomas then admitted he was the intended victim of the shots of appellant; and that he (Bill) fired at the appellant, after the latter shot Mc-Coy, the single pistol shot heard following the two reports from the shot gun. In addition, the same admission was shown by the testimony of two or more other witnesses to have been made by Bill Thomas to them.

Besides that already mentioned, much other evidence in rebuttal was introduced on the trial, but it is believed that discussed presents the material facts necessary to an understanding of the questions to be decided. The appellant complains of the admission by the trial court of the testimony of K. M. Jones, Mrs. Lilly McCoy, Emil Kriel, witnesses in rebuttal, to the effect that Bill Thomas said to each of them, in substance: "I shot at pap (meaning appellant) and pap shot Walter (the deceased); and if it hangs pap, or ruins pap, or convicts him, whatever he did say, it's so." This statement was made by Bill Thomas to Jones when the latter arrived at the place of the shooting and while Thomas with pistol in hand was supporting the body of the wounded man, McCoy; and to Mrs. McCoy and Kriel on the same day, shortly after the shooting. The importance to the Commonwealth of the testimony of these witnesses will be understood when it is recalled that Thomas in testifying in chief for his father, the appellant, stated that McCoy shot at appellant and handed him, Thomas, the pistol before appellant shot him; and, on cross-examination, denied that he made to Jones, Mrs. McCoy and Kriel the above statement related by them. The testimony of the three witnesses referred to was clearly competent for the purpose of contradicting the testimony in chief of Bill Thomas and discrediting him as a witness; and the jury were properly admonished by the court that the statements, if made by him, could be considered by them for that purpose and no other. Moreover, the foundation for its introduction had properly been laid by his previous denials of the making of the statements. In brief, the method pursued by the trial court in permitting the introduction of the evidence in question, was one expressly provided by the Code, section 598, for impeaching a witness.

The appellant's complaint of the trial court's allowing the introduction of evidence to prove the reputations of the appellant and Bill Thomas for untruthfulness and immorality is without merit. As witnesses who had given testimony on the trial the reputation of each of them was open to such an attack, and as the attack appears to have been conducted according to the rules of procedure controlling the introduction of such evidence, the admission of the evidence was not error. It is ininsisted for the appellant that the trial court erred in admitting in evidence as a dying declaration, the state-

ment of McCoy made after he was shot to Jones and others to the effect that "Bill Thomas was the person the appellant tried to kill; that he had to die in Bill's place; and that he had his hand up begging Jim Thomas (appellant) not to kill Bill when he shot him." We think this evidence was properly admitted, because it was made to appear from the testimony of those who heard the statement that in each instance it was made by McCoy under a consciousness of impending death and when McCoy was without hope of this life. Asop v. Comwth., 164 Ky. 171; Eversole v. Comwth., 157 Ky. 478; Begley v. Comwth., 154 Ky. 30; Dowel v. Comwth., 154 Ky. 601.

The record shows no error in the exclusion of evidence by the court. The appellant's contention that the declarations of his wife, contained in the affidavit of Jim Fee, made to the deceased and Bill Thomas before the shooting of the former, looking to the prevention of the difficulty between them and appellant, should not have been excluded by the trial court, is without support from the law. Such declarations through another are no more competent as evidence in the appellant's behalf, than would have been her sworn statements as a witness, for the wife cannot testify for the husband, or the husband for the wife.

The appellant's further contention that the trial court erred in refusing to instruct the jury as to his right to defend his home, is also without support from the record. The instruction upon the law of self-defense given by the court, and which correctly and aptly defines that right, covers every ground that, upon the facts of this case, could have justified or excused the killing of McCoy or the killing of Bill Thomas by the appellant. Instructions must be predicated upon the facts of the case; so before a court is required or justified in giving an instruction to the jury which submits a defense for its consideration there must be evidence upon which to base such an instruction. Brennon v. Commonwealth, 169 Ky. 815; Smith v. Commonwealth, 122 Ky. 444. It is apparent from the evidence in this case that at the time of the shooting of McCoy by the appellant, neither the home of the latter nor any inmate thereof was in any danger at the hands of McCoy or Bill Thomas. Both left the house and started home several minutes before the shooting, and were across the road and the appellant in front of the house

when the shooting occurred; and according to the latter's own testimony and that of his witnesses, it was injury to his person and not his home or family that he feared when he shot and killed McCoy. It is our conclusion, therefore, that no necessity was apparent for the giving of the instruction in question, hence the failure or refusal of the court to give it, was not prejudicial error. The instructions given are not objected to or criticised, and in our opinion they contained as a whole the entire law of the case.

The appellant's final contention that the verdict is not supported by the evidence, is wholly untenable. The evidence was conflicting, but as that of the Commonwealth strongly conduced to prove that the killing of the deceased resulted under such circumstances as showed it to have been intentionally and maliciously accomplished, rather than in self-defense as claimed by the appellant and the evidence in his behalf tended to show, the finding of the jury in accordance with the evidence of the Commonwealth, will not be disturbed. Especially is this so, when, as in the instant case, the record manifests no error on the part of the trial court which could have prejudiced any substantial right of the appellant.

Judgment affirmed.