## White v. Commonwealth.

(Decided September 28, 1928.)

### Appeal from Pike Circuit Court.

1. Criminal Law.—Instructions are based on testimony which, if believed by jury, would give rise to certain rights, which they should embody, but, if there is no testimony on which to base instruction, court's failure to give it cannot be considered error.

2. Homicide.—In trial for murder, testimony held not to warrant instruction defining defendant's right to defend his home.

3. Homicide.—In trial for murder, evidence held sufficient to support conviction of voluntary manslaughter.

E. J. PICKLESIMER and W. K. STEELE for appellant.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At his trial in the Pike circuit court upon an indict-ment charging him with murdering Corbett Nunnery, the appellant and defendant below, Wallace White, was convicted of voluntary manslaughter and punished by confinement in the penitentiary for a period of two years and one day. On this appeal from the judgment pronounced on the verdict of the jury, appellant by his counsel makes but one argument for a reversal of the judgment and in support of his motion for a new trial, and which is: That the court failed to give to the jury the whole law of the case, and which failure consisted in not giving a separate instruction defining defendant's right to defend his home, and in support of that contention the cases of Eversole v. Commonwealth, 95 Ky. 623, 26 S. W. 816; McKinney v. Commonwealth, 82 S. W. 263, 26 Ky. Law Rep. 565; Watson v. Commonwealth, 132 Ky. 46 116 S. W. 287, and Hoover v. Commonwealth, 192 Ky. 490, 233 S. W. 1042, are cited and relied on. Many other cases upholding the right to such an instruction in criminal

prosecutions where the facts authorized it, as was true in the cited and relied on cases, might also have been referred to.

There can be no doubt of the correctness of the argument of counsel if there were testimony in the record tending to establish the facts calling for the instruction contended for, since it is a fundamental principle in the practice that instructions are based upon testimony heard upon the trial, which, if believed by the jury, would give rise to certain rights which the instructions should embody. If there is no testimony upon which to base an instruction, it should not be given, and the court's failure to do so cannot be considered as error. Those principles are so universally recognized and applied as to require no citation of opinions or other authority for their support.

The deceased was the brother of defendant's wife. The killing occurred near noon one day in July, 1927, in defendant's residence, wherein deceased was shot by defendant with a shotgun, and his body fell through the door of the residence onto the front porch. No one was in the house at the time except the three persons above mentioned. Passersby, and also the wife of the deceased, just immediately preceding the shooting, heard loud talking in the room wherein the only three persons in the house were located. At least the preponderance of the testimony was to the effect that one of the voices engaged in what appeared to be a quarrel was that of a woman, which, if true, was necessarily the wife of the defendant. Immediately upon hearing the shot, the wife of the deceased went from her residence a short distance away to that of the defendant, and discovered the prostrate body of her husband lying in the door, with the upper portion on the floor of the porch. She embraced him and commenced weeping aloud, and while thus engaged, she testified, that the wife of defendant appeared and put a knife in the left hand of deceased, who was almost but not quite dead, but he expired a few minutes thereafter.

Defendant did not appear to be in the least excited or agitated. Both he and his wife stated to a number of witnesses who gathered there, including the sheriff of the county, that deceased accidentally killed himself while attempting to lift the gun with which he was shot from behind a trunk where it had been placed, and, when de-

fendant on his trial was interrogated about such statements, he did not deny them, but contented himself by saying, "I do not remember." His version of the killing as testified to at the trial was that deceased held some grudge against him, and on the day before the homicide while at defendant's home some harsh words passed between the two, and other witnesses testified that on the afternoon of that day deceased made threats against defendant, but the cross-examination of the witnesses who testified to them effectually destroyed the credibility of their testimony. It was thereby quite conclusively shown that the alleged threats were largely if not entirely manufactured. No motive was expressed by deceased as a foundation for them, and, according to the witnesses, they were made when the relationship between defendant and deceased had not been mentioned by any one. On the contrary, as testified to, the deceased, without defendant or the subject being mentioned, spontaneously breathed the threats to which the witnesses testified, and which is of itself so unnatural as to shake one's confidence in its truthfulness. Moreover, some of the witnesses testifying to such threats could give neither the month, the day of the week, nor the year in which they were alleged to have been made. Other developments on the cross-examination strengthened the conviction that the witnesses were, to say the least of it, doing their utmost to favor the defendant's cause. Upon the immediate occasion of the killing, as testified to by defendant, the deceased came into his house and inquired why defendant had "butted into his business," which defendant denied, and then followed a quarrel in which deceased called defendant a liar and a coward, followed by defendant applying the same epithets to him, when deceased grabbed a knife that was lying on the top of the kitchen cabinet and started towards defendant, who shut the door separating the kitchen from the front room, but which deceased immediately opened, and, while passing the place where the shotgun was placed, defendant picked it up and fired the fatal shot. No one claims or intimates that deceased threatened any harm to any member of the household except to defendant himself, nor did deceased forcibly enter defendant's house. On the contrary, the proof shows that he was in the habit of frequently visiting there, and had at least an implied invitation to do so, although during the quarrel resulting in the homicide defendant testified that he told deceased to leave.

Clearly, under the testimony as so substantially outlined, there was no room for the instruction contended for. The cases supra, and which are relied on in support of the contention, present a far different state of facts. In some of them the security of defendant's residence was threatened by an attempt of forcible entrance by the deceased; while in others the deceased either threatened or grossly insulted other members of the family in addition to defendant, and in still others of them the specific question of practice was not presented, an illustration of which is the Eversole case. At the time that case was tried, it was the prevailing practice in this jurisdiction to insert in the self-defense instruction what has come to be known as the "means of escape" element, and it was contended therein that it should not have been inserted in the instruction in that case, since defendant had the right to "stand his ground" without making any effort at flight to escape the danger created by the deceased, because he was within his own residence. The present condition of the law upon that phase of the practice is pointed out in our opinion in the case of Burden v. Commonwealth, 216 Ky. 787, 288 S. W. 742, and will not be repeated here, since the self-defense instruction in this case embodied no such element.

The facts of this case are very analogous to those in the cases of Thomas v. Commonwealth, 195 Ky. 623, 234 S. W. 1, and Winchester v. Commonwealth, 210 Ky 685, 276 S. W. 575, in each of which the same contention now under consideration was made. In denying it, we said in the Thomas opinion:

"Instructions must be predicated upon the facts of the case; so, before a court is required or justified in giving an instruction to the jury which submits a defense for its consideration, there must be evidence upon which to base such an instruction."

In the Winchester opinion, in making the same denial, we said:

"There was no evidence that Cogar (deceased) had any hostility to any one at Winchester's home except him, or intended any violence to any one else. . . . The defendant himself testified that he shot the deceased because he was advancing on him with the knife and he believed himself in danger."

And the court held that the usual self-defense instruction was all that defendant was entitled to.

In this case, we repeat, deceased frequently visited the home of defendant who married his sister. On the occasion in question they got into a quarrel during which the lie was passed by both, and during which the two engaged in loud talking that was heard by the neighbors, quickly followed by the shooting. The jury could have found from the testimony that defendant's wife placed a knife in the hands of deceased after he was shot, and there is no doubt but that each of them told a different story as to the killing from that testified to by defendant on the trial. Even according to defendant's testimony, he was the sole target of both the words and conduct he attributed to the deceased, and he fired the fatal shot in defense of his own person and not in defense of any member of his household or of the sanctity of his residence. We therefore conclude that there was enough evidence to support the verdict, and that the court did not err in failing to give the instruction contended for.

Wherefore the judgment is affirmed.