## Banks v. Commonwealth.

(Decided January 25, 1929.)

NAPIER & HELM for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On April 20, 1928, about 4 o'clock p. m., the appellant and defendant below, Sam Banks, shot and killed Richard Vancleave, for which he was indicted, charged with murder, and, upon his trial thereunder, he was convicted and punished by confinement in the penitentiary for his natural life. On this appeal by him, his counsel argue five alleged errors for a reversal of the judgment, which are: (1) That the verdict is flagrantly against the evidence; (2) refusal of the court to direct defendant's acquittal because of insufficiency of the evidence to authorize a submission to the jury; (3) misconduct (a) of the commonwealth's attorney in his closing argument to the jury, and (b) of a juror in qualifying for service after having formed and expressed an opinion; (4) error of the court in failing to give the whole law of the case in its instructions to the jury, and (5) newly discovered evidence.

Errors (1) and (2) are to be determined from a consideration of the testimony, and for that reason they will be disposed of together. Both appellant and the deceased were in the employ of the Kenmont Coal Company in Perry county. Defendant was married and had a family,

but the latter, more than a month before the homicide, returned to the old home in Breathitt county, after which defendant, with one Brewer, rented and occupied a room from a Mrs. Clemons. Just before the shooting, which occurred in that room, defendant, Brewer, Sherman Roberts, and Sherman Hayes had gathered therein and were occupying at least a portion of their time in imbibing intoxicating liquor. The members of the party sat upon the sides of two beds that were in the room and while so situated the deceased entered the room, and, according to some of the witnesses, he sat down on the side of one of the beds; while others say he remained standing at the foot of the bed with his elbow upon the foot railing. Defendant extended the hospitalities of the home to him by offering him a drink, but which was refused with the remark by deceased that he had not touched liquor for more than six years. A pistol was lying on the bed upon which defendant sat, and, a short while after the entry of deceased, Roberts arose, with the intention of leaving, and started out the front door. Others of the party followed, including defendant, but the latter obtained the pistol that was on the bed and had it in his hands as he started to leave. About the time defendant passed deceased the first shot was fired, followed by three or four others, resulting in the instant death of deceased, his body having been hit, according to the undertaker, as many as five times.

In stating what occurred at the immediate time of the shooting the witness, Roberts, said: "When I got up and started home, Sam Banks got up and started behind me. When I started he got on down where Richard Vancleave was and stepped in to the left of me when I strated out, and he threw up his hands and a pistol fired." Immediately after the parties got on the outside of the room, the same witness stated: "I asked him (defendant) what he did that for and he said he done it to get rid of six years' trouble, he said he had been in hell for six years," and which, according to witness, occurred about two minutes after the shooting. Another witness, or perhaps two, testified to the same remarks made by defendant. On cross-examination the same witness was asked and answered:

"Q. How close was Sam Banks to you when he fired the first shot? A. He stepped behind me. He was just behind me, close to me.

"Q. How did he do? A. Swung his pistol and fired and I saw the man fall."

The witness Brewer testified to substantially the same as did the witness Roberts, but he furthermore said that he saw defendant get the pistol and saw deceased fall to the floor, and that defendant continued to shoot at him and fired his pistol two or three times after deceased fell, and witness finally said to him: "Do not give him any more," to which defendant answered: "It is too late to say anything now." Witness also stated that deceased had his side to defendant at the time, and after he was shot the first time he cried: "Lord have mercy!" The witness Hayes, who was a half-brother of defendant and introduced by him, did not materially contradict the testimony of Roberts and Brewer, nor did he corroborate the testimony of the defendant, since he had gotten to the door, or perhaps out on the porch, before the shooting began. He did state, however, that just before the shooting he looked back and saw defendant start out of the room, and deceased "started along the foot of the bed, and I turned and started on out and the pistol began to shoot."

Defendant in his testimony stated that his party had been in the room about 5 or 10 minutes before deceased entered it, and, in giving an account of what occurred, he said: "I went to pass him and I got to the foot of the bed and he got me and swung me around and grabbed the pistol, and said: 'Here's what I've got for you' and the pistol fired." He was asked and answered:

"Q. How many times did the pistol fire? A. Four or five times.

"Q. Tell the jury why you shot him? A. I was afraid of him.

"Q. Why? A. Because he was acting like he was going to kill me. . . .

"Q. Was his back turned to you when the shot was fired? A. He was starting past me."

No weapon of any kind was found on the body of deceased, and it will be observed that defendant did not attempt to describe the actions or conduct of deceased at the time of the homicide but contented himself with stating his conclusion that he (deceased) "was acting like he was going to kill me."

Defendant entered into a long harangue about an alleged prior intimacy between deceased and his (defendant's) wife which he stated began about six years before that time. His wife joined the church and made a confession to him. It was also proven that deceased on some occasions had made tantalizing remarks about defendant, and one witness stated that deceased said he had separated defendant and his wife and "he was going to have to kill him for it." It will be observed from the brief statement we have made of the testimony, as given by the eyewitnesses, that no threat or angry remark was made by deceased upon the occasion of the homicide, except that attributed to him by defendant in his testimony, but which was not necessarily harmful nor angrily made. It is perfectly apparent from the entire record that defendant had become jealous of deceased and determined to avenge his actual or imaginary wrongs by killing him. It would be going far afield and into regions wholly untraveled by this or any other court to justify defendant in shooting the deceased on the occasion of the homicide under the facts testified to by all of the witnesses, except himself, and it is doubtful if he testified to enough to justify his killing deceased under his right of self-defense. But be that as it may, it is perfectly apparent that both grounds (1) and (2) are without merit, and cannot be sustained.

Under subdivision (a) of ground (3) it is argued that the commonwealth's attorney, in his closing argument to the jury, said: "Counsel for defendant said in his argument that defendant was *facing* the worst crime known to the law of the land," when in fact counsel for defendant had said that his client was *"charged* with the worst crime known to the law of the land." In other words, the difference in the two statements attributed to counsel in his argument consisted in the use of the word "facing," as used by the commonwealth's attorney, and the word "charged," as used by the defendant's counsel; but which, to our minds, is a "distinction without a difference." Evidently the indictment did charge defendant with such a crime, and, after being so charged, he was *facing* it, or it was facing him, until he got rid of it. In an effort to sustain this ground, some five or six pages of counsels' brief are taken up with referring to cases from this court, dealing with remarks of prosecuting counsel, and in which they were held to be prejudicial, but none

of which we need consider because of the unsubstantial nature of that ground as relied on in this case.

In support of subdivision (b) of ground (3) it is shown by the affidavit of the witness Sam Hayes, the half-brother of defendant, that Wade Woods, who was accepted and sat on the jury some time before the trial, stated to affiant: "I would like to get on the jury trying his (defendant's) case. I would acquit him." That remark by the juror was alleged to have been made on April 29, 1928, nine days after the homicide, and the trial was had on June 15 thereafter. Hayes sat with defendant and his counsel while the jury was being selected, and he states in his affidavit that he, as assistant of his brother in the selection of the jury, did not impart the expressed opinion of Woods to either defendant or his counsel, but which it is, to say the least of it, most difficult for us to believe. Defendant and one of his counsel filed their affidavits, in which they stated that neither of them had any knowledge thereof, but whether the other attorney knew of it does not appear from the record. If there was no other reason for disallowing this objection, we would feel ourselves very much inclined to do so upon the conviction that, under the stated facts, either defendant or some one of his counsel knew of the expression of the juror's opinion forming the basis of this ground.

But it will be observed that the opinion expressed by the juror was in favor of defendant, and not against him. As far back as 1821, in the civil case of Evans v. McKinsey, Litt. Sel. Cas. 262, this court held that a similar expression made by one who later sat on the jury did not furnish grounds for setting aside the verdict returned against the one in whose favor the expression was made, upon the all-sufficient reason that it, instead of manifesting partiality against the movant, was in his favor, and that the verdict contrary thereto should be attributed to the fact that the juror who so expressed his opinion was otherwise convinced by the testimony heard at the trial. In so holding, the opinion says: "This court is unable to perceive any reason for disturbing the verdict, on the ground of the discovery (of the juror's expressed opinion) made by McKinsey. If the verdict had been against Evans, the evidence introduced by McKinsey (proving the ground) might have formed very satisfactory evidence of the partiality of the jury against

him; but it is difficult to imagine how the declaration of one of the jury, that he would find for McKinsey, can be construed into evidence of partiality against him, so as to warrant the court in setting aside the verdict found contrary to those declarations. The circumstances of the verdict being contrary to the juror's declaration is conclusive to show that, if those declarations were in fact made, they must have been either the effusions of mirth or levity, and that, when called on to decide the contest, the juror, under the more solemn and controlling influence of his duty and oath, gave a decision free from that bias which he might otherwise have been supposed to entertain.''

The principle of practice so announced was again referred to and approved by us in the case of Rice Ex'rs, etc., v. Wyatt, 76 S. W. 1087, 25 Ky. Law Rep. 1060. The same ground for reversal was argued in that case, but, in disposing of it, the opinion, inter alia, said: ''The misconduct of the juror, James Boyd, consisted in talking about the case pending its trial, it being alleged that he expressed the opinion to Charles Harper that 'The will would have to go.' . . . This, as said in the case of. Evans v. McKinsey, Litt. Sel. Cas. 262, might have been a ground for the opposing party obtaining a new trial, but not for the contestant.'' See, also, 35 C. J. 335, and 20 R. C. L. pages 240 and 251. The cited cases from this court, and other foreign ones that will be found cited to the text authorities referred to, state the rule to be that the expression by a subsequently accepted juror of a favorable opinion to the litigant, who eventually loses his case, does not manifest partiality against him sufficient to authorize the setting aside of an unfavorable verdict against him. We anticipate, however, that, if it were shown on the hearing of the motion for a new trial that the favorably expressed opinion of the juror was a ruse for the purpose of getting on the jury in order to render an adverse verdict, a new trial should be granted; but no such showing is or was attempted to be made in this case. We therefore conclude that this ground is without merit.

In support of ground (4), it is argued that the instruction of the court upon the right of defendant to defend his home (his room in which he boarded being considered as his home) improperly submitted it, and to which we agree, but upon the ground that it was more favorable to defendant than he was entitled to, if he was

entitled to such submission at all. But, under the recent case of White v. Commonwealth, 225 Ky. 596, 9 S. W. (2d) 720, and other cases from this court referred to therein, defendant was not entitled to an instruction on his right to defend his home, since there was no evidence to authorize it. Deceased entered the room in which the homicide occurred without objection from defendant or any one else, and no objections to his having done so were afterwards expressed. On the contrary, up to the very moment of the beginning of the shooting, none but friendly remarks and social conduct were engaged in, and it is not pretended that deceased attempted in any manner to harm or disturb any of the guests of the defendant who were in his room at that time. Conceding that under some circumstances one has the right to defend his home, it does not justify him in killing another in his home who peaceably visits it unless the circumstances are such as to create an assault upon his home or its inmates. Without such assault, a killing therein is governed by the same principles that govern homicides committed elsewhere. It is, therefore, apparent that this ground is also without merit.

The alleged newly discovered evidence is that one A. J. Griffis would testify that the commonwealth's witness, Brewer, after the shooting began ran out of the room in which it occurred onto the front porch, and that he was so situated at the time of the firing of the last two shots which affiant (the newly discovered witness) heard, and he also saw Brewer when he came out of the house. In the first place, the testimony at best could only be a contradiction of Brewer, but which we conclude it did not do, since he (Brewer), although he may have been on the front porch, could have seen through the open door the firing of the last two shots that occurred after he went out of the room, according to the discovered witness Griffis. However, Brewer did not say in his testimony that he saw the last two shots fired, nor what particular shots he saw fired; but only that he did see *some* shots fired in the body of deceased after the firing of the first one, from the effects of which he fell to the floor. Moreover, the discovered witness, Griffis, lived in the house immediately joining the one where the shooting occurred, and it would appear that the slightest diligence would have instituted an inquiry of the persons living immediately adjacent thereto to discover what facts, if any, they knew with reference to the shooting resulting

in the homicide. But whether so or not, we are convinced that this ground is altogether insufficient to merit further discussion or authorize a reversal of the verdict.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.