## Ponton v. Commonwealth.

(Decided June 25, 1937.)

W. A. DAUGHERTY and W. W. BARRETT for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At about 8 o'clock a. m. on September 14, 1935, the appellant and defendant below, Joe Ponton, shot and killed Tilden Deskins. It occurred at the side of defendant's business building in Belfry, Pike county, Ky.— his business being the operator of a gas station in front of his building and within it he conducted a whisky dispensary, occupying the rear room thereof as sleeping quarters. The grand jury later indicted him and accused him of murdering his victim. At his trial thereon he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for fifteen

years. On this appeal, prosecuted by him therefrom, his counsel urges as grounds for reversal, (1) that the verdict is flagrantly against the evidence; (2) failure of the court to give to the jury by its instructions the whole law of the case; (3) error in the jury returning a verdict fifteen minutes after it retired to its jury room —it being contended that the time was too brief to give the case due consideration, and (4) discovered bias of one of the jurors (Will Phillips) made after the return of the verdict. They will be determined in the order named.

1. Counsel in discussing ground (1) in their brief confine themselves to the testimony as given by their client in parts of which he was corroborated by at least one more witness and possibly two, but they ignore the testimony of some seven or eight other eyewitnesses flatly contradicting defendant and his witnesses, and whose account of the killing show it to be an entirely inexcusable one. Briefly stated, the salient and material facts are—that defendant arose and dressed himself about 7 o'clock on the morning of the fatal day and went into his dispensary from his bedroom. About that time the deceased appeared in a very much intoxicated condition and wanted to buy a pint of liquor. It is intimated by some of the witnesses that defendant declined to let him have it because deceased had no money with which to pay for it; but the bulk of the testimony, including that given by defendant himself, was that deceased was already then in an advanced stage of intoxication. Some words occurred at the time, as being spoken by deceased, of the nature and kind generally indulged in by one in his condition, some of which may have been more or less abusive toward defendant. At any rate the latter instructed him to get out of the house and go away. He complied with the first part of the request and went out of the house where the gas station was located. There he got in company with two associates named Justice and the three soon began to quarrel among themselves, in which more or less loud talking was indulged, mixed with profanity and threats, and defendant went to his front door and ordered them from the premises and away from his place of business. The two Justices agreed to and perhaps did obey that command, but deceased declined to do so and again applied some blasphemous and more or less scurrilous language to the defendant.

When defendant first arose and went into his place of business a clerk whom he had employed at that time had arrived, and soon thereafter (and some time before the shooting) Nellie Wallace, who worked at defendant's place of business as a bookkeeper, also arrived. Immediately following the last wordy altercation above referred to defendant concluded to go to his breakfast and went through his building and into his sleeping apartment; passing out of its side door to get into his automobile stationed some 30 or 40 feet from his building, for the purpose of going to where he expected to eat his breakfast. Between his automobile and his building was a large truck, and as he passed by it the deceased threw a beer bottle towards him which struck the opposite side of it from the one defendant was passing. It was a bottle about one-half filled with beer that deceased had in his hands, and which he had procured from some place (perhaps the defendant's dispensary) a short while before. The witness, Wallace, testified that as defendant passed through his sleeping apartments he obtained and put in his pocket his 44 caliber pistol, the pocket in which he put it being one especially prepared for the purpose—it having a seamed hole in the bottom similar to that of a button hole through which the end of the barrel could pass. The witness (Wallace) requested him not to so arm himself, but he refused to heed her warning, and when deceased threw the bottle and it struck the truck the thrower, in a maudlin and staggering condition, started toward the truck which was some 20 feet from him, and defendant started around it towards him. Deceased then made a slight movement in the opposite direction, but soon turned meeting defendant, and when each of them arrived on the same side of the truck facing each other defendant shot deceased three times, at least one of which was in his foot, which was fired after he had fallen to the ground from the effects of the first shot, which was the fatal one.

In describing the events at the immediate time and place of the shooting, defendant in his testimony said:

"When I got to the back end of the truck he was face to face at me and when I was coming around the truck I pulled my gun as I went around the truck because I thought he was behind me, I didn't know where he was and I was making pretty good speed and pulling the gun at the same time.

"Q. Pistol you mean? A. Yes, sir, Pistol, and when I got around the end of the truck there he was facing me and I just shot.

"Q. Do you know how many shots you fired? A. There was three empties out of the gun.

"Q. Do you know what he was doing while you were firing those shots? A. Yes sir, when I come around the back end of the truck he was coming toward me and hands were in his hip pocket."

From that testimony it will be seen that defendant relies on his right of self-defense. As stated, but one, or possibly two, other witnesses in describing the same scene testified that deceased had his hands back in or towards his hip pocket, he being in his shirt sleeves, and wearing a pair of overalls. It later turned out that he did have in his hip pocket a bottle about half filled with liquor and that he had no weapon of any sort whatever. But, as previously stated, a far greater number of witnesses testified for the Commonwealth, including the witness Wallace, that deceased was doing nothing but, perhaps bending forward his body, as though he was about to fall, or leaning against the truck at the time defendant got into position to face him and that he then immediately fired the three shots at deceased. They also describe—and defendant does not deny it—that he appeared to be traveling at a fast gait in going around the truck after it was struck with the bottle thrown by deceased, and in such manner as to cause the witness to say that he was "hunting deceased." When defendant arrived in a facing position to the deceased the witness Wallace was looking out of the side window of the building immediately adjacent to the spot and she saw defendant drawing, as well as later pointing his pistol at deceased, and she besought him not to shoot. A number of other witnesses who testified heard her urgent request, and defendant does not deny it; but had he done so, it is overwhelmingly proven.

The greater number of witnesses referred to—other than defendant and his one or two corroborating witnesses—also testified that at the time of the shooting they were in plain view of the deceased and that his hands were swinging at his sides with no effort on his part to reach any of his pockets with either of them. Deceased was not immediately killed and lingered long enough to be carried to a hospital at Wiliamson, W.

Va., where he later died. Before he was removed from the spot where he fell defendant gave directions that an ambulance be sent for, and in doing so he said: ''Call the hospital or call the ambulance for I don't give a God damn.'' Others say that in making that request he stated he wanted the body ''of that s—— of a b——'' removed away from his premises. He did not deny it. Of course, those remarks, made after the shooting, only prove the defendant's state of mind and clearly indicate no penitence or other regrets entertained by him because of being compelled to take the life of his fellow-man in his necessary self-defense. It would be an altogether useless and profitless task for us to attempt to give even the substance of the testimony of each witness in detail, since the unanimous tenor of it, as above outlined (all of which was given by unimpeached witnesses and impressively stated), clearly and conclusively refute defendant's claim of self-defense. It may be admitted that deceased was more or less pestiferous and annoying from the time defendant first met him in his store that morning until the latter started to go for his breakfast, as he described; and it also might be admitted that such conduct was altogether inexcusable and especially so if indulged in by one who was in full possession of his faculties and who had not numbed them by the consumption of excessive quantities of liquor as the deceased had evidently done, but none of it furnished grounds for his slaying by defendant. The right of self-defense is based upon occurrences taking place at the immediate time of the difficulty in which the accused committed his offense. The jury was amply justified in finding as it did that at the time he was killed, deceased was doing nothing and was stationary in a helpless stage of intoxication. If that testimony was true, and we have no right to disbelieve it, he met his death at the hands of defendant in more or less brutal fashion and without any legal excuse whatever therefor. It is therefore clear that none of the cases cited by counsel in support of ground (1) have a remote bearing on the facts of this case, and for which reason they are entirely inapplicable. We therefore conclude that it is without merit.

2. In support of ground (2) counsel argue that it was the duty of the court, under the facts adduced by the testimony, to instruct the jury as to the right of defendant to protect his home and his place of business

from unjustifiable invasions and threatenings on the part of the deceased. In the recent case of Hatfield v. Commonwealth, 264 Ky. 721, 95 S. W. (2d) 562, 564, the same contention was made, and denied by us. In doing so, we said: "It will be observed that according to the testimony of herself and mother, she shot the deceased and did so to avert her death at his hands, he at that moment having a pistol pointed at her. Accepting this version of the killing, she shot and killed the deceased in defense of herself and not of the home. It follows that she was not entitled to an instruction defining her right to defend the home." In the opinion the prior case of Payne v. Com., 255 Ky. 533, 75 S. W. (2d) 14, was referred to and it is also strong authority in upholding our determination of ground (1) supra. In addition to the Hatfield opinion, other prior and recent ones to the same effect are Cooper v. Com., 234 Ky. 56, 27 S. W. (2d) 405; Farmer v. Com., 234 Ky. 673, 28 S. W. (2d) 978; Smith v. Com., 236 Ky. 736, 33 S. W. (2d) 688; Com. v. Girkey, 240 Ky. 382, 42 S. W. (2d) 513, and Black v. Com., 240 Ky. 620, 42 S. W. (2d) 883. Others are cited in those opinions and in each of them the right to the particular instruction contended for was denied because the deceased at the time of the killing was not shown to have been guilty of conduct looking to an unjustifiable assault on defendant's home, habitation, or other premises. It is easy to be seen that this ground is entirely without merit, since no instruction is authorized or called for in the absence of testimony as a basis therefor. Payne Case, supra.

3. Ground (3) is a most unique one, and consequently no case is cited in support of it. To begin with, the question, if a material one, is not properly presented to this court for determination. It is manifested only by an affidavit of defendant. It involves a matter that occurred at and during the trial and not thereafter. Such prior occurring matters, not required to be entered upon the record at the time, should be manifested by a bill of exceptions duly certified by the trial judge. Technically speaking, therefore, we have no such question for determination. However, if the practice in that respect should be disregarded, the question then is entirely without merit. Cases and texts are cited, which say that it is the duty of the jury to give the case due consideration, and which is true as to every conscientious juror, as well as every court participating in the

trial of prosecutions, or any other character of litigation. But how is it to be determined whether or not the jurors as the case progressed formulated an opinion which could be quickly arrived at when they retired to their room for making their verdict? Really, we are not astonished that but a short time was consumed in the performance of that task in the light of the testimony heard at the trial. The argument, aside from being a unique one, is also, as we conclude, a wholly unfounded one, and for which reason it is also dismissed as being without merit.

4. Lastly, it is argued in support of ground (4) that a juror, Will Phillips, was biased toward defendant (or toward one charged with homicide) so as to disqualify him, and which he concealed on his voir dire examination. Such bias on his part is attempted to be shown by the affidavits of a deputy sheriff and a constable of Pike county, both of which were filed by defendant after the return of the jury's verdict. They stated in their affidavits that a short while before Phillips—who was a member of the regular panel for the term—was called or accepted on the jury that tried defendant, they heard him talking to someone with reference to a homicide case in which he had served as a juror at the same term of court, and in which he stated that he hung the jury in that case (it being one of Com. v. Roland Mosely) and that he caused the defendant therein to be found guilty and punished by two years' confinement in the penitentiary, and that "he believed when a man had killed another he should have a sentence regardless and he was in favor of giving him [Mosely] fifteen years." Such was the affidavit of Stanley, the deputy sheriff. The other affiant was Dan McCoy, a constable of Magisterial District No. 6 in Pike county, and he stated that Phillips said that he was on the jury that tried Mosely and was the one that caused him to be punished by confinement for two years in the penitentiary and "that the other jurors were for acquittal and he said that he thought when a man killed another he ought to get something." The juror in response to those affidavits absolutely denied any such statements on his part indicating bias either against defendant, or one accused of the same crime. However, he acknowledged that upon the occasion referred to by the deputy sheriff and constable he was approached by some one to know how the jury stood in the Mosely

Case, whereupon he stated that he was for giving Mosely five years in the penitentiary but that others of the jury held out for two years and he later consented thereto. He denied emphatically of having said that "when a man had killed another he should have a sentence regardless," and furthermore stated that he had no partiality whatever against defendant in the instant case, nor did he have any opinion in the case when he qualified as a juror.

At the outset, while it would not deprive defendant of the benefit of this ground if it was sustained by the proof, we deem it not amiss to say that the two officers of the county by whom defendant sought to establish it were clearly remiss in the performance of their duties in remaining silent after hearing such expressions, as they swore to in their affidavits, from a summoned juror, without imparting that information to the judge, or some officer of the court by which defendant's rights might be protected in the premises. We make that remark only for the purpose of showing that we doubt very much that the occurrences which they swore to ever happened. Evidently the court, in considering their affidavits, and in the light of the circumstances as contradicted by the testimony of the juror, Phillips, concluded that the charge was entirely groundless, and in which we concur. The cases cited and relied on by counsel for defendants (as the excerpt which they incorporate in their brief expressly point out) presented situations where the alleged discovered and disqualifying bias was established by "*uncontradicted* evidence." In discussing one of the cases (Ellis v. Commonwealth, 207 Ky. 162, 268 S. W. 1087, 1088), counsel say that we reversed that judgment "because it was shown *without contradiction* that one of the jurors" was biased as contended for. Our opinion in that case said: "Similar questions have several times been considered by this court, and in many cases, where there *was a controversy* as to whether the acts evidencing bias had actually taken place, this court has refused to disturb the finding on that question by the trial court." (Our italics.) The same is true with all of the cases cited by appellant's counsel, as well as those cited by counsel for the Commonwealth, and also as to every case that neither of them cited wherein the question was presented for determination. Therefore, no case upholds counsels' contention that this record presents a situation wherein the

verdict should be set aside because of the alleged bias of the juror Phillips.

After a careful consideration of the entire record, our conclusion is that none of the errors relied on for a reversal of the judgment are sufficient to authorize it, and for which reason it is affirmed.