## Gadd v. Commonwealth.

April 29, 1947.

Rehearing denied September 26, 1947.

W. J. Baxter, Judge.

J. P. Chenault for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

John Gadd, the appellant, was convicted of the offense of voluntary manslaughter of Raymond Damrell. Punishment was fixed at confinement in the penitentiary for fourteen years. He appeals.

It is now contended that the judgment should be reversed because the trial court committed the following prejudicial errors, viz.: (1) That of overruling appellant's motion to discharge all prospective jurors who had read the newspaper account of the offense on trial; (2) that of admitting incompetent evidence during this trial; (3) that of rendering this judgment upon a verdict not sustained by any evidence; (4) that of failing to instruct the jury in the whole law of the case.

We now summarize the story of this homicide. John Gadd, age 71, lived alone at a small roadside restaurant and filling station owned by him and located on the west side of U. S. Highway 25 about two miles south of Berea and about one-half mile north of the Rockcastle County line. He was also engaged in the illegal sale of whiskey at the same location. About a quarter

mile north of this place, which was the scene of the homicide, Gadd owned another roadside place on the same side of the same highway. This second place was occupied by Raymond Damrell, age 19, who was Gadd's tenant. Damrell was living in this second, northward place with his wife and was likewise operating a filling station as well as an illegal liquor rendezvous upon the same premises. The shooting of Damrell was done by a shotgun in the hands of Gadd. It occurred around 4:30 or 5:00 o'clock P. M., on January 29, 1946, in front of the southward, filling station operated by Gadd. Damrell died as a result of this shooting on April 28, 1946. Damrell had been drinking to excess during the recent times of his occupancy of Gadd's place and Gadd, having become dissatisfied with Damrell's tenancy, had been trying unsuccessfully to dispossess Damrell by legal proceedings. On the afternoon in question, Damrell was under the influence of liquor. He drove to Gadd's headquarters and engaged him in a brief but peaceable conversation and then drove a short distance southward along the highway. After five or ten minutes, Damrell came back northward along the highway to Gadd's place and stopped. Some conversation then took place between Gadd and Damrell on the subject of Gadd's recent attempt to dispossess Damrell. During this conversation Gadd was at or near the doorway of his living quarters. Damrell first stepped out of his car toward Gadd, but almost immediately he returned to the car and sat on the edge of its seat under the steering wheel and hung his feet out of its door and upon the ground. The distance between Gadd's position at his own door and Damrell's position at the car was 30 or 40 feet. During their conversation, which apparently grew more heated with each passing moment, Gadd stepped inside his quarters and procured a shotgun. This seems to have occurred about the same time that Damrell returned to the driver's seat in his own car. Damrell called Gadd a God-damned liar and an old white-headed son-of-a-bitch, immediately following which Gadd fired one shotgun blast towards the head of Damrell, thus blinding and wounding him so that he died about 3 months later. Gadd stated that he had feared that Damrell had a weapon in his car and was about to make an attack therewith; that he could not see

one of Damrell's hands, which he thought might have been holding a weapon at the time of the shooting. However, subsequent investigation revealed that Damrell had no weapon of any kind either on his person or in his car. Some evidence was produced tending to show that Gadd had previously stated, in substance, to more than one witness that he would shoot Damrell "in two" if he could not dispossess him through regular, legal proceedings. Immediately following the shooting, Gadd informed some neighbors about this event and instructed them to see about Damrell. Thereupon Gadd departed to the home of his mother, who was about 100 years of age and who lived at Christmas Ridge in the same general community. He sent word to the officers about this homicide and as to where he could be found. He then remained there at Christmas Ridge until he was arrested a few hours later by officers of the law. Damrell, immediately after the shooting, emerged from his car on the side opposite to Gadd's quarters. He then walked, or probably stumbled, northwardly along the highway, and, as he did so, he called to Gadd two times asking him not to shoot. After Damrell had walked a very short distance northward along the highway, he sat down at a culvert by the side of the highway, where he remained until about 9:00 P. M. Then and there he was found in an unconscious condition by the investigating officers and was taken to a hospital in Berea for medical attention. Neither Gadd nor his neighbors gave the wounded Damrell any aid or assistance during the ensuing period of four hours when he sat or lay by the highway immediately after the shooting.

1. The trial court overruled appellant's motion to discharge prospective jurors who had read the newspaper account relating to this homicide. He contends that this was an error. We have carefully read this newspaper account, which was made a part of this record. But we see nothing in such news story except a reportorial account of this entire incident. We see nothing inflammatory about it, since it merely set out the facts and then stated that Gadd had surrendered himself and that he had previously been at liberty on a $3000 bond. The story does not seem to imply that criminal responsibility necessarily had to attach to Gadd.

Section 209, Carroll's Kentucky Criminal Code of Practice, provides as follows:

"It shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of the crime with which the prisoner is charged, if such juror shall state on oath that he believes he can render an impartial verdict according to the law and the evidence; and provided further, that in the trial of any criminal cause the fact that a person called as a juror has formed an opinion or impression, based upon rumor or upon newspaper statements (about the truth of which he has expressed no opinion), shall not disqualify him to serve as a juror in such case, if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and the evidence, and the court shall be satisfied of the truth of such statement."

The record of this case also shows that the jurors were interrogated under oath as to whether or not they had read the newspaper story in question; that those jurors who admitted that they had read the story made statements under oath that they had no opinion as to the guilt or innocence of Gadd; that such jurors stated under oath that they could and would give Gadd a fair and impartial trial on the sole basis of the law and evidence of the case.

Therefore, under the Code provisions and under the indications of this record, all as set out above, the trial court did not, as we believe, commit error in overruling appellant's motion to discharge the newspaper-reading, prospective jurors of this case. See also cases of Green v. Commonwealth, 223 Ky. 826, 4 S. W. 2d 1109; Tate v. Commonwealth, 258 Ky. 685, 80 S. W. 2d 817. We really consider that it should be a matter of pride to the jurisprudence of any county that its jurors read the daily newspapers, for it has been truthfully said that "newspapers are the world's mirrors." We wonder whether Madison County, where two of the State's foremost colleges are located, could ever empanel any group of jurors without newspaper readers scintillating among them like Pleiades on a clear night.

2. Appellant also contends that the trial court committed error in admitting incompetent evidence on this

trial. We have read all the evidence produced on the trial and while some errors were, as usual, committed in the trial court's rulings as to admissibility of evidence, yet we do not believe that there were, upon the whole case, any prejudicial errors in this respect. The closest question, which arose in this phase of the case, consisted of the admission of such evidence as tended to show that appellant had been engaging in the illegal liquor business, both at his own place of business and also, through Damrell, at the northward place of business.

The general rule is that when an accused is put on trial for a particular offense, if he is to be convicted by any means, it must be by evidence showing him to be guilty of that offense alone rather than by evidence showing him to be guilty of other offenses. In support of this rule, we are pleased to cite the very cases mentioned by able counsel for appellant, viz., the cases of Brashear v. Commonwealth, 178 Ky. 492, 496, 199 S. W. 21, and Peck v. Commonwealth, 286 Ky. 347, 150 S. W. 2d 919.

However, this general rule, above stated, only applies to cases where the offense charged and the other one offered to be shown are quite distinct and are separated by a clear line of demarkation. The general rule does not apply where the subject material under investigation is of such a nature that it may consist of several stages or continuous acts, all constituting one general transaction. While the prosecution cannot show separate and isolated crimes or facts having no bearing whatever upon the crime under investigation, yet all the circumstances may be shown which have a connection with the particular crime charged, even if, in doing so, other offenses may be brought to light. See 10 R. C. L. 940. Now, in the instant case, one of the preliminary causes of friction and ill feeling between Gadd and Damrell seems to have consisted of the unskillful business methods of Damrell in selling illegal liquor for and on behalf of Gadd. It appears that Damrell had, on one or more occasions, failed to make full accounting to Gadd for the proceeds of liquor sales. Gadd's own testimony, under its full development, showed that this had been one of his complaints against Damrell resulting in Gadd's desire to remove Damrell as a tenant. There-

fore, it seems that the illegal selling of liquor, practiced both by Gadd and by Damrell, was a circumstance so closely connected with this homicide that the trial court was justified in admitting evidence relating to the "bootleg" business carried on by both these parties.

3. Appellant still further contends that the judgment of the trial court was rendered upon a verdict which was not sustained by any evidence. We have outlined in rather full detail, in the first part of this opinion, the evidence produced on this trial, and we do not believe that any impartially minded person could agree with appellant as to this contention. However, we do not wish to criticize him nor his counsel for grasping at this or any other straw in their legitimate struggle to keep abreast of the surface of the placid waters of acquittal in this case. Gadd shot Damrell at a distance of 30 or 40 feet when Damrell had no weapon of any kind and when he was sitting in a parked car, and if the jury believed, as they had a right to do, some of the witnesses, this shooting took place after Gadd had made threats against Damrell to the effect that Gadd would shoot him "in two." Under these circumstances, we have no hesitation in saying that ample probative evidence was produced on this trial to sustain the verdict of the jury and the judgment of the court.

4. Appellant's last contention is in regard to the instructions to the jury, which instructions, he says, were substantially correct but did not contain the whole law of the case. Gadd contends that he was entitled to an instruction incorporating his right to defend his home. But there was no evidence whatever showing that Damrell threatened appellant's home or that he made any kind of assault thereon. Neither was there any evidence showing that any person whatever was within appellant's home at the time of this altercation. So far as we have learned from this record, appellant lived alone. The trial court gave an instruction incorporating appellant's right of self-defense, and it is apparent from this record that appellant's theory of innocence in this case was based upon his right to defend his person rather than his home.

Where the only defense claimed by an accused was that he was defending his person, it was not error to

omit any instructions as to defense of his home. See Thomas v. Commonwealth, 195 Ky. 623, 243 S. W. 1; Duff v. Commonwealth, 250 Ky. 555, 63 S. W. 2d 593.

Where the accused was in his own yard but hostile demonstration was made only to his person, he was not entitled to an instruction on his right to defend his home. See Engle v. Commonwealth, 258 Ky. 118, 79 S. W. 2d 417.

In the absence of evidence showing that the deceased was making an unjustifiable assault on the home or place of business of the accused, no instruction was authorized incorporating the right of the accused to defend his home. See Ponton v. Commonwealth, 269 Ky. 614, 108 S. W. 2d 535.

Therefore, under the established law of this jurisdiction and under all the circumstances, as they were presented to us by the evidence on this trial, it is our firm conviction that appellant was not entitled to any instruction relative to his right to defend his home.

Wherefore, having carefully examined the record of this case and having found no errors to the prejudice of appellant's substantial rights, it is now our duty to affirm the judgment of the trial court.

The judgment is affirmed.