74          KENTUCKY REPORTS.    [Vol. 133.

Fidelity Deposit Company, of Maryland, v. Champion Ice Mfg.
and Cold Storage Co.

CASE 10.—ACTION BY THE CHAMPION ICE MANUFACTUR-
ING & COLD STORAGE COMPANY AGAINST THE
FIDELITY & DEPOSIT COMPANY, OF MARYLAND,
ON A FIDELITY INSURANCE POLICY.—March 24,
1909.

# Fidelity Deposit Co., of Md. v. Champion Ice Mfg. and Cold Storage Co.

Appeal from Kenton Circuit Court (Criminal, Common Law and Equity Division).

W. McD. Shaw, Judge.

Judgment for plaintiff, defendant appeals—Reversed.

1. Evidence—Necessity of Producing Best Evidence.—The best evidence obtainable must be produced by the party who has the burden of proving any issue.

2. Evidence—Best Evidence of Amount of Employe's Defalcations.—The best evidence of the amount of an employe's defalcations would be the testimony of witnesses from whom he collected the money that he failed to account for.

3. Evidence—Proof of Employe's Defalcation—Exception to Rule Requiring Best Evidence.—If, from an examination of the books and records of a storage company, alone, the amount of an employe's defalcations may be ascertained, and a summary of what the books and records showed was placed at the disposal of the surety company before the trial of a suit against it for his default, and reasonable time and opportunity given it to examine the same, a witness, who examined them for the storage company and made up the statement of the losses, might be offered by it, and his summary offered in evidence, showing the persons from whom the employe collected money and the amount in each case.

4. Evidence—Hearsay—Summary of Statements by Numerous Persons.—In an action on a policy of fidelity insurance, the amount of the employe's defalcations was shown by a witness, who testified to what he ascertained from books of the employer and from persons who had paid the employe money not accounted for and not shown by the books, and by a written statement made by him showing the name of each person from whom the employe received money and the amount. In some instances the information in the written statement was obtained from the books, and records of his

Fidelity Deposit Company, of Maryland, v. Champion Ice Mfg.
and Cold Storage Co.

employer, but in the majority of instances they did not dis-
close the amount paid, and it was necessary to see the persons
who made the payments. Held, that the exception to the
rule requiring the best evidence, made necessary by the
volume of record evidence in particular cases, did not go so
far as to authorize the admission of such hearsay evidence as
to the amount paid by the different persons who should have
been produced as witnesses, notwithstanding an objection
that it would be impracticable and involve great and un-
necessary expense.

5. Trial—Reception of Evidence—Numerous Depositions as to
Payments Made—Introduction of Brief Summary of Facts.—
If it is necessary to take the deposition of a large number
of witnesses to prove payments made by them, it would be
admissible for a party offering their evidence to have an
intelligent and brief summary of the essential facts stated
by them made up in such form that the court or jury might
understand it without the necessity of hearing all that the
witnesses had to say.

6. Insurance—Fidelity Insurance—Construction of Bond—Re-
newals—Amount of Liability.—A fidelity bond provided that
it might be continued from year to year, at the option of
the employer, at the same or agreed rates, so long as the
surety company should consent to receive it, in which event
the company should remain liable for any act of an em-
ploye between his original date and the time to which it
should be continued, and that the company should be bound
for any loss "occurring during the continuance of this bond,
and discovered during said continuance or within six months
thereafter." In the original bond, which was continued from
time to time, and in the certificates of continuance, it was
provided that the company's liability should not exceed a
specified sum, whether the loss occurred "during the term
above mentioned or during any continuation or continuations
thereof, or partly during the said term and partly during said
continuation or continuations." Held, that the company could
not be held responsible for loss exceeding the sum specified,
no matter when it occurred, provided that it was within
the period covered by the bond or the continuation certificates,
and that each renewal could not be treated in such case as
a separate contract so as to authorize recovery for an
amount exceeding the sum specified.

S. D. ROUSE and C. B. THOMPSON for appellee.

### CLASSIFICATION AND AUTHORITIES.

1. The bond involved is construed as a policy of insurance.
The representations of the ice company were not warranties, and
section 639 of the statutes applies. (Bentham v. Guarantee Com-
pany, 7 Exchequer 744; Champion Ice Mfg. & Cold Storage Co.
v. American Bonding Co, 115 Ky., 863; Warren Deposit Bank v.
Fidelity & Deposit Co., 116 Ky., 38; Fidelity & Guarantee Co. v.
Western Bank, 29 R., 639; American Surety Co. v. Pauly, 170
U. S., 133; section 639, Kentucky Statutes.)

Fidelity Deposit Company, of Maryland, v. Champion Ice Mfg.
and Cold Storage Co.

2. To constitute a liability under the bond it was not necessary
that Blick should be technically guilty of either larceny or em-
bezzlement.   A fraudulent conversion was all that need be
shown. ₁ (Champion Ice Mfg. Co. v. American Bonding Co., 115
Ky., 863.)

3. The limitation clause in the bond cannot apply because there
is another provision in the bond which extends this period suffi-
ciently to cover the discovery made in this case. If there is any
ambiguity, it must be revolved against the bonding company.
(American Surety Co. v. Pauly, 170 U. S., 133; Champion Ice
Co. v. American Bonding Co., 115 Ky., 863; DeJernette v. Fidelity
& Casualty Co., 98 Ky., 558 (distinguished); Bank v. Fidelity &
Deposit Co., 128 N. C., 366; 38 S. E., 908; Wallace v. Insurance
Co., 41 Fed. R., 742; Stearns on Suretyship, Sec. 256.)

4. The evidence submitted by the plaintiff was competent and
sufficient to establish the shortage. This case comes within a
well defined exception to the rule requiring primary evidence.
(Greenleaf cn Evidence, Sec. 93; Encyclopedia of Evidence, Vol.
2, p. 284; Barton v. Driggs, 20 Wall., 125; L. & N. Bridge Co. v.
L. & N. R. R. Co., 116 Ky., 258; L. & N. R. R. Co. v. Daniel, 28
Rep., 1146; Northern Pacific Ry. Co. v. Keges, 91 Fed. R., 47;
U. S. Fidelity, etc., Co. v. Blackly, Hurst & Co., 117 Ky., 127;
Standard Oil Co. v. Fidelity & Casualty Co., 21 Rep., 399.)

5. The bonding company was liable for the full amount of the
shortage proved, because for no one year did the shortage equal
$2,500.00, the amount of the bond. Each continuation certificate
was a separate contract. These contracts are to be construed so
as to avoid a forfeiture. (DeJernette v. Fidelity & Casualty Co.,
98 Ky., 558; Bank v. Fidelity & Deposit Co., 128 N. C., 366; 38 S.
E., 908; Wallace v. Insurance Co., 41 Fed. R., 742; Stearns on
Suretyship, Sec. 256.)

ERNST & CASSATT and JONES & JONES for appellant.
CLASSIFICATION.

1. Conclusions of an expert accountant (in the form of a sum-
mary) as to the result of comparing his conversations with wit-
nesses with the books of an ice company are not ocmpetent to
prove the amount of a shortage under a policy of fidelity insur-
ance.   (Poor v. Robinson (1877), 76 Ky. (13 Bush), 290; Louis-
ville Bridge Co. v. L. & N. R. R. (1903), 116 Ky., 258, distinguished;
Ritchie v. Kinney (1870), 46 Mo., 298; Rollins v. Board of Com-
missioners (1898), 90 Fed., 575; Bartlett v. Wheeler (1902), 195
Ill., 445.)

2. Proof of loss is not prima facie evidence of a claimed amount
of shortage under a policy of fidelity insurance.   (16 Amer. &
Eng. Enc. of Law (2 Ed.), 968; American Surety Co. v. Pauly
(1897), 170 U. S., 159, distinguished.)

3. Where the only evidence offered to show loss under a policy
of fidelity insurance is that enumerated in points first and second,
there should be judgment for defendant.   (See cases under points
first and second.)

4. Where a policy of fidelity insurance for one year is successively extended from year to year, said policy constitutes one contract and each extension constitutes a new contract as respects time, and merely extends the indemnity in the original policy of fidelity insurance to a new period of time, and forbids a recovery for an amount in excess of $2,500.00, the amount stipulated, particularly where the policy expressly so stipulates. (American Bonding Co. v. Monon (1906), 80 Ark., 49; First Nat. Bank v. Fidelity & Guaranty Co. (1902), 110 Tenn., 10; DeJernette v. Fidelity & Casualty Co. (1896), 98 Ky., 558, distinguished.)

OPINION OF THE COURT BY JUDGE CARROLL—Reversing:

The appellee storage company had in its employ as bookkeeper Edward S. Blick, and applied to the appellant surety company to execute a policy of fidelity insurance for Blick. Thereupon the surety company executed its policy in the sum of $2,500, guaranteeing the fidelity of Blick for one year from the 1st day of July, 1900, to the 30th day of June, 1901. The policy, among other things, provided that during said period "It is hereby agreed and declared that subject to the provisions and conditions herein contained which shall be conditions precedent to the right on the part of the employer to recover on this bond, the company shall at the expiration of three months next after proof of a pecuniary loss as hereinafter mentioned has been given to the company, reimburse the employer to the extent of the sum of $2,500, and no further; such pecuniary loss as the employer shall have sustained by any act of larceny or embezzlement on the part of the employe in the performance of the duties of the office or position in the service of the employer hereinbefore referred to, as the same have been or may hereafter be stated in writing by the employer to the company, and occurring during the continuance of this bond, and discovered during said continuance, or within six months thereafter, or within six months after the death, resignation or removal of the employe from the service of the employer when the same occurs prior to the ex-

piration of this bond. This bond may be continued from year to year at the option of the employer at the same or an agreed rate, so long as the company shall consent to receive the same, in which event the company shall remain liable for any act of larceny or embezzlement committed by the employe between the original date of this bond and the time to which it shall have been continued, provided that the liability of the company as surety for the employe to the employer shall not exceed the amount above written, whether the loss shall occur during the term above named, or during any continuation or continuations thereof, or partly during said term and partly during said continuation or continuations.''

The policy was continued from year to year until 30th day of June, 1905; the certificates of continuance executed each year being as follows: ''In consideration of the sum of $12.50, the Fidelity & Deposit Company of Maryland hereby continues in force bond No. ——, in the amount of $2,500.00, on behalf of Edward S. Blick, * * * subject to all the covenants and conditions of said original bond heretofore issued on the 1st day of July, 1900; provided, that the liability of the Fidelity & Deposit Company of Maryland as surety for the employe to the employer shall not exceed the amount above written, whether the loss shall occur during the term of the bond above named, or during any continuation or continuations thereof, or partly during the said term and partly during any continuation or continuations thereof.''

The storage company did not discover any defalcation on the part of Blick until November, 1905, which was within six months after the expiration of the last continuance certificate. When the defalcation was discovered, an examination of the accounts of Blick was made by an expert accountant, and it was found that the defalcations all occurred between July 1, 1901, and July 1, 1905. The amounts embezzled during each of these years, beginning the

1st day of July and ending on the 30th day of June,
were as follows: In 1901-02, $34.52; 1902-03,
$456.29; 1903-04, $1,011.17; 1904-05, $1,513.68—ag-
gregating $3,015.66. When the defalcation was dis-
covered, notice was at once given to the surety com-
pany, and demand made upon it to reimburse the
storage company in the amount of the loss. The
surety company declining to pay, this suit was
brought upon the bond and the certificates of con-
tinuation. By agreement the law and facts were
submitted to the court, and a judgment rendered
against the surety company for the full amount of
the loss. We are asked to reverse the judgment upon
the following grounds pointed out in brief of coun-
sel for the surety company: (1) Because there was
no competent evidence introduced to establish the
alleged losses sustained by the storage company; and
(2) because the court, in any event, erred in render-
ing a judgment for a sum in excess of $2,500.

The embezzlements occurred in this way: The stor-
age company did a large business in receiving for
storage articles and goods for a great number of
people. When these goods were received by the
storage company, an entry would be made upon the
books of the articles received and the name of the
owner, and when the articles were removed from the
storage warehouse, Blick would receive from the
owner the fee charged for storage and give him a re-
ceipt therefor, but would not put upon the books any
statement of the delivery or the money received, and
in this way he embezzled from the company and ap-
propriated to his own use the amounts received from
these customers. The owners of the goods stored,
and from whom Blick received the storage fees, num-
bered over 100, and the amount received from each
was usually small. As the books of the company did
not show the amounts received from all these differ-
ent persons, it became necessary to see many of them
and obtain statements of the sums paid to Blick by

them.   Upon the trial of the case, the storage com-
pany did not introduce any of the persons who paid
Blick, but offered a witness who had seen these per-
sons and procured from them information of the
amount paid Blick, and in connection with this wit-
ness offered a written statement made by him show-
ing the name of each person from whom Blick had re-
ceived money and the amount so received.   The wit-
ness  testified that  he ascertained from the books
the names of the persons who had stored goods, and
then saw the owners of the goods, and obtained the
data from which he made the statement. ' From this
evidence, and some other obtained from an inspec-
tion of the books of the storage company alone, all
of which was objected to, the court ascertained the
amount of the defalcation.   In some instances the in-
formation in the written statement containing a sum-
mary of the defalcations was obtained from the books
and records of the company alone, but in the majority
of instances the records of the company did not dis-
close the amount paid, and hence it was necessary to
see the persons who made the payments.

The first question to be determined is:   Was this
evidence competent to establish the loss suffered by
the storage company and ascertain the amount due
to it by the surety company?   As the surety company
denied all liability, the burden of proving the amount
for which it was responsible under the bond was
placed upon the storage company.   It was therefore
essential that the storage company should prove the
extent of its losses before it could recover against the
surety company.   This being true, the next inquiry
is:   How should the losses have been proven?   It is
a rule, to which there are few exceptions, that the
best evidence obtainable must be produced by the
party who has the burden of proving any issue. Mani-
festly the best evidence of the amount of Blick's de-
falcations would be the testimony of the witnesses
from whom he collected the money that he failed to

account for; but it is insisted by counsel for the storage company that to obtain this evidence would be impracticable and entail great and unnecessary expense, and we are furnished with some authority holding that, in exceptional cases, it is allowable to pursue the course adopted by the storage company in the preparation of its case; but the authorities do not go to the extent of supporting the contention of counsel. If, from an examination of the books and records of the storage company alone, the amount of Blick's defalcations could have been ascertained, and a summary of what these books and records showed had been placed at the disposal of the surety company before the trial, and reasonable time and opportunity given to it to examine the books and records, the witness who examined them for the storage company and made up the statement of the losses might have been introduced by it, and the summary made by him offered in evidence, showing the names of the persons from whom Blick collected money and the amount so collected from each. This method of proving the loss, although not the best, would, under the established exception to the rule requiring the best evidence, have been competent.

The reason given for the admissibility of secondary evidence in this class of cases is very well stated in Louisville Bridge Company v. P., C. C. & St. L. R. Co., 116 Ky. 258, 75 S. W. 285. In that case, which involved a complicated settlement of accounts extending over a period of years and innumerable items, a summary made by the clerks was verified by the officer of the company under whose supervision and oversight the work was done, and who testified to its correctness. In holding this summary under the circumstances to be admissible, the court said: "It was unnecessary to bring in all the clerks who had made out the original waybills or prepared the numerous statements. The waybills, being the records of the company of its transactions made at the time, were

original evidence, and admissible without further proof, because made and kept as a record in the usual course of business. The proof by the two witnesses who testify to the correctness of the statements made up from these waybills was sufficient to make out a prima facie case, which was supported by the commissioner's own investigation, and his finding the statements correct in so far as he tested them; but, of course, he could not examine all of the items. The papers would perhaps have filled the courtroom, and no good could have come from bringing them in before the judge, for no court could go through all these papers and make up a statement. If he did it, not being a practiced accountant, his work might have been worth intrinsically less than his commissioner's. * * * The issue in this case depended upon a statement to be made up from thousands of waybills, which, if all brought in, would have filled up the commissioner's office. The only practical way of getting at the truth was to make out a statement from these waybills. If either party doubted the accuracy of the statement when prepared, the court could afford him access to the papers, and give him opportunity to manifest the truth to him. To demand of the plaintiff more than was shown here would be to deny a recovery in cases of this character. The rule of evidence is that no evidence shall be received where there is better evidence which may reasonably be had. It is intended to prevent fraud, but it is not intended to prevent the administration of justice, where all the evidence is produced by the party of which the case is reasonably susceptible. * * * The evidence in the case is the original record kept by the railroad company of the transactions as they occurred. The statements or tables prepared by the clerks are not, properly speaking, evidence at all. They are only exhibits of the fact shown by the evidence. If the court doubted their correctness, he should have had correct statements or tables pre-

pared; but it was not necessary to do this when those offered were proved to be presumptively correct, and there was no showing made that they were incorrect. The court has a sound discretion in determining matters of this sort, in the interest of substantial justice, and we see no error in the admission of the matters in question."

In Rollins v. Board of Commissioners, decided by the United States Circuit Court of Appeals, and reported in 90 Fed., 575, 33 C. C. A. 181, the question at issue involved an examination of a multitude of accounts, a summary of which was made and offered in connection with the testimony of one Crump. Objection was made to the introduction of this summary, and in overruling it the court said: "A number of exceptions were taken to the testimony of John W. Crump, a witness on behalf of the defendant county, who had prepared tabulated statements from records and books of the county, and which were admitted in evidence. It is clearly apparent that on the trial of a case of this character before a jury, which involved the ascertainment of the amount of the indebtedness of the county on many different dates through a period of a number of years, and also required proof of the dates of the creation of the debts represented by the warrants sued on, it would be absolutely impossible for the jury to retain in their memories the dates and amounts of the numberless items put in evidence, and it would be different for them to take a memoranda thereof; and yet without such an aid to their memories it would be impossible for them to reach an intelligent verdict. In such cases it is admissible to pursue the method adopted by the trial court; that is to have the books, papers, and other items of original evidence offered and received, and in connection therewith to admit the testimony of a competent person who has prepared a tabulated statement in writing summarizing the numerous items offered in evidence. The original

sources of information being in evidence, the correct-
ness of the tabulated statement can be readily verified
by an examination of the witness and a comparison
with the sources from which the statement has been
compiled, and, being thus verified, it becomes a very
valuable aid to the jury. Where no statements of
this kind are offered in connection with the testi-
mony of the person who has tabulated the same, care
must be taken to confine the same to matters in-
cluded within the primary evidence properly intro-
duced, for this method of summarizing for conven-
ience sake numerous items giving the date and
amounts cannot be made the means of putting before
the jury the conclusions of the witness drawn from
sources of information which are not in evidence.''
To the same effect is Northern Pacific R. Co. v. Keys
(C. C.) 91 Fed. 47.

We fully indorse the rule laid down in these cases,
but do not feel disposed to extend it as we are asked
to do in this case. The exception, which is an in-
novation upon the established rules of evidence made
necessary by the volume of record evidence in partic-
ular cases, does not go so far as to authorize the
admission of the hearsay evidence upon which the
judgment appealed from was rested. The case of
L. & N. R. Co. v. Daniel, 122 Ky. 256, 91 S. W. 691,
3 L. R. A. (N. S.) 1190, relied on by counsel for ap-
pellee, does not support the propositions that the
information obtained from the persons who paid
Blick, by the witness who testified, was admissible.
In that case the record of the train dispatcher,
testifying from entries made at the time in his train
sheet, as to the arrival and departure of trains,
which information was received by him from various
operators, was admitted upon the ground that it was
as reliable, ''as saleman's, drayman's, porter's, or
wharfinger's information conveyed to a bookkeeper,
who makes the original entries thereof, all of which
is now nearly everywhere allowed to be proven by

the introduction of the book entries so made as evidence of the facts shown by the entries.   The entrant discharges a duty which he has assumed, only in the keeping of an accurate record of his entries. He makes them contemporaneously with the act which they represent.   They are made in the regular course of transactions, which, to be utilized in the business, must from greatest necessity be precise and true.   They are made in the habit and system of keeping such a record with regularity.   Every consideration by which it is possible to establish the existence of a past event, by testing the accuracy of the evidence of it, is satisfied by such record.''   In the case of Standard Oil Co. v. Fidelity & Casualty Co., 51 S. W. 571, 21 Ky. Law Rep. 399, the evidence offered and rejected was within the rule of admissibility approved by us, and the same observation may be made respecting the case of United States Fidelity & Guaranty Co. v. Blackly, etc., Co., 117 Ky. 127, 77 S. W. 709, 27 R. 1271.

But to permit a witness to state what A. B. C. and D. told him, not in the presence of any person representing the surety company, would be to approve the introduction of hearsay evidence of the most objectionable character.   Of course, the surety company could have sent an agent to see these various persons, and have thus ascertained the truth of the statement made to the representative of the storage company upon which his summary was based; but the surety company was under no obligation to do this. It was the duty of the storage company to make out its case by competent evidence, and, although the procuring of this evidence may have entailed a great deal of trouble and expense, this fact cannot be allowed to dispense with the necessity of proving a claim by the best evidence that it is practicable to obtain.   If, however, in cases like this, it becomes necessary to take the depositions of a large number

of witnesses, it would be admissible for the party offering the evidence to have an intelligent and brief summary of the essential facts stated by the witnesses made up in such form as that the court or jury might understand it without the necessity of hearing all that the witnesses had to say. We therefore think it was error to permit the summary of the statements obtained from persons who paid money to Blick to be introduced as evidence in connection with the testimony of the witness who obtained these statements. The record does not disclose what part of the defalcation was shown by the books and records of the company alone; but, as to so much of it as could be shown in this way, it would be competent to permit a witness who made a summary of the losses from the books and records to state the amount, provided his summary was previous to the trial furnished to the surety company, and it was given reasonable time in which to make such an examination of the books, records, and accounts as it desired to make.

The next question is: Did the court err in rendering a judgment in excess of $2,500? It will be observed that the bond, among other conditions, contained this: "This bond may be continued from year to year at option of the employer at the same or agreed rate so long as the company shall consent to receive the same, in which event the company shall remain liable for any act of larceny or embezzlement committed by the employe, between the original date of this bond and the time to which it shall have been continued." And the further stipulation that the liability of the surety company should be bound for any loss "occurring during the continuance of this bond, and discovered during said continuance or within six months thereafter." In accordance with these stipulations, the surety company was liable for any loss sustained by the larceny or embezzlement of Blick at any time between the date of the

original bond and the termination of the last certificate of continuance, provided the defalcation was discovered within six months after the termination of the last certificate. In other words, the effect of the continuation certificates was to extend the period of time the bond should run, thereby making it cover any loss that occurred between July 1, 1900, and the 30th day of June, 1905. But, in the original bond, and in each certificate of continuance, there is the following condition: "Provided that the liability of the company as surety for employe to employer shall not exceed the amount above written ($2,500), whether the loss shall occur during the term above mentioned or during any continuation or continuations thereof, or partly during the said term and partly during said continuation or continuations."

So that, in no event, and under no conditions, could the surety company be held responsible for a loss exceeding $2,500, unless the plain unmistakable language of the contract is to be disregarded. There is no ambiguity in this language limiting the liability, nor can there be any doubt that it was immaterial when the loss occurred, provided it was within the period covered by the terms of the bond and the continuation certificates. Under this contract of indemnity, including the continuation certificates, if the whole embezzlement had occurred during the first year, but had not been discovered until within six months of the expiration of the last continuance certificate, the surety company would nevertheless be liable for the full amount specified in the bond, and so, if the defalcation was partly in one year and partly in another, the company would be liable. The lower court, however, took the position that each continuance certificate was a separate independent contract, and hence the surety company was liable in an amount not exceeding $2,500 each year. In other words, according to this construction of the

bond, the surety company might have been required to pay, if there had been a defalcation of $2,500 in each of the five years, a total sum of $12,500. In our opinion this is not the fair construction of the bond. It is not susceptible of this interpretation. If it is possible for a surety company to limit its liability upon a bond of this character to a specified sum, the language of this bond and the continuation receipts accomplish this purpose.

The case of Dejernett v. Fidelity & Casualty Co., 98 Ky. 558, 33 S. W. 828, 17 R. 1088, relied upon by counsel for the appellant, is not in conflict with the views herein expressed, nor does it in our opinion sustain the judgment of the lower court. The principle, in fact only, question before the court in the Dejernett Case, was one of limitation—whether or not the defalcation was discovered within the time limited in the bond—and the court held that, as it was not, there could be no recovery. It was also decided that each of the renewal certificates was in effect a new contract of assurance, and constituted a separate and distinct policy of indemnity for the time covered by each renewal. In the case before us, it is also true that each certificate of renewal was issued for a consideration, covering a specified time, and was a new contract in the sense that it extended the indemnity provided for in the original contract. First Nat. Bank v. Fidelity & Guaranty Co., 110 Tenn. 10, 75 S. W. 1076, 100 Am. St. Rep. 765. But the conditions contained in the original contract and each of the certificates of continuation heretofore referred to, limiting the liability of the company to $2,500, must be read together as part of the same contract. The original contract contemplated that certificates of continuation might be issued, and expressly provided that, no matter how many were issued, the liability under the bond and all of the certificates should not exceed the amount specified. So that, if we should treat each renewal as a separate contract, there must

be read, in connection with and as a part of it, the stipulation in the bond and certificate limiting the liability. In response to the argument that the liability should be limited to $2,500, it is said that this construction would have the effect of releasing the surety company from any liability during the period covered by the continuation certificates if the employe should embezzle during the year covered by the original bond the sum of $2,500, and hence the storage company would be without indemnity for all of the years covered by the continuation certificates, although during each of those years it had paid for the indemnity. It is true that, under our construction of the contract, the surety company would not be liable for any embezzlements occurring during the period covered by the continuation receipts provided the employe embezzled, during the period of the original bond, the full amount, specified therein; but we are unable to perceive how this fact can operate to make the surety company responsible for losses it did not agree to protect the employer against. It would do violence to the plain letter of the undertaking to say, in the face of the contract, that the surety company was responsible in any sum exceeding $2,500.

Wherefore the judgment is reversed, with directions for a new trial in conformity with this opinion.