## Hall v. Commonwealth.

(Decided April 26, 1932.)

JOHN W. CAUDILL and OSCAR P. BOND for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON. RICE, Assistant Attorney General, for appellee.

508

Opinion of the Court by Creal, Commissioner—Affirming.

Monroe Hall and Ed Gayhart were jointly indicted in the Floyd circuit court for the murder of Don Stephens, and, on separate trial, the former was convicted of manslaughter, and his punishment fixed at imprisonment for two years. He has appealed.

As grounds for reversal, his attorneys argue that the court erred in instructing the jury, and that the verdict is flagrantly against the evidence.

Instruction No. 4 on the right of self-defense is the only one called in question. It is vigorously argued that, by the use of the word ''avoiding,'' the court, in effect, told the jury that appellant could not avail himself of the right of self-defense if he could have avoided the danger by fleeing. In the recent case of Caudill v. Commonwealth, 239 Ky. 712, 40 S. W. (2d) 334, this court, in disposing of a similar contention, said:

''The judgment on the former appeal was reversed because the self-defense instruction embodied by the use of the word 'escaping' the idea that appellant, in order to avail himself of the right of self-defense, had 'to retreat to the wall.' On the second trial, the court eliminated the word 'escaping' from the instruction and substituted in lieu thereof the word 'avoiding.' While it would have been better for the court to have followed the time-honored form of a self-defense instruction as may be found in Hobson on Instructions, sec. 758, et seq., it has been expressly held that the form in which the instruction was given and the use of the word 'avoiding' instead of 'escaping' is not erroneous. Connor v. Commonwealth, 118 Ky. 497, 81 S. W. 259, 26 Ky. Law Rep. 398.''

And in the very recent case of Greenbury Hall v. Commonwealth, 242 Ky. 717, 47 S. W. (2d) 538, decided March 11, 1932, an instruction practically identical to the one complained of here was held not to be prejudicial or erroneous. As pointed out in Caudill v. Commonwealth, supra, it would be better for trial courts to follow the form of self-defense instruction as given in Hobson on Instruction, sec. 758 et seq. We might add that the

adoption of this suggestion would avoid misunderstanding and confusion, and we see no good reason why courts should persist in refusing to follow it.

For the commonwealth, it is shown that Freddie Newsom and his three sons, Johnie, Casey, and George, together with Don Stephens, left Wheelright Junction a short time before the tragedy, and were walking along the railroad track toward Weeksbury. They were followed and overtaken by Posey Scott, Ed Gayhart, and appellant, all officers. The officers called to them to stop, and, upon their failure to comply with that command, Scott said, "If you don't stop, I will shoot," and within a very short time a number of shots were fired. Scott was killed instantly, and Don Stephens received a gunshot wound from which he died the following day. It does not appear that the officers acquainted Freddie Newsom with the fact that they had a warrant for his arrest, or of their purpose to make an arrest. There is evidence for the commonwealth to the effect that Don Stephens had left his companions and gone off to the side of the railroad near the bridge. Witnesses, who detailed what they saw of the difficulty, testified that no shots were fired from the place where Stephens had gone, but that some of the officers fired shots in that direction. It appears that at the time it was getting dark and was difficult to recognize persons at any considerable distance. Witnesses could see blazes from the pistols, and in that way judged the direction of the firing. There was also evidence for the commonwealth tending to indicate that Stephens was not armed. One of the witnesses testified that, when he requested help in carrying Stephens to a hospital, appellant said, "Shucks, I shot the G—— d—— s—— o— b——, let him lay there and die." Appellant emphatically denied that he made such a statement, and to some extent he is corroborated by other witnesses.

For appellant, it is shown that about 5 o'clock in the afternoon Ed Gayhart was accosted by Stephens and his companions near the hotel. All of them were armed, and, while the elder Newsom seemed to be the spokesman for the crowd, the rest of them collected around him in a threatening attitude with their hands on their pistols. They said to him, "We understand you fellows are going to kill us the first time we pass up the road." He pro-

510

tested that they were mistaken, and that he had said nothing about them. They then asked, ''Where is the rest of that damn bad law?'' mentioning the names of Tom Bates and William Johnson, also officers. Upon leaving Gayhart, the Newsoms and Stephens went toward their home, but later came back to the restaurant of Orville Collins where Gayhart was, and again brought up the subject and assumed threatening attitudes. A number of witnesses testified that at the time the Stephens boy had a pistol. They left the restaurant and started to their home, and a few minutes later appellant and Scott drove up. Scott stated that he had a warrant for the Newsoms, and asked Gayhart to go with him and assist in arresting them.

Appellant testified that, when they neared Stephens and the Newsoms, Scott called to them to halt, and that, when he did so, two of the boys jerked their pistols and went over the bank, and the other two went on up the track; that Scott went on in the direction of Freddie Newsom, and, when he reached him, they clinched. About that time the men on the railroad opened fire and a general fight ensued. He admits that he fired five shots at the men who shot Scott; that two men were standing on the railroad shooting Scott, one of whom he recognized as George Newsom, but that he did not know the other. Gayhart testified that he fired some shots at some of the crowd who were standing near the house of J. M. Hall, but he did not fire any shots at the Stephens boy, who was standing on the railroad track.

From the foregoing, it will be seen that there is a marked and irreconcilable conflict in the evidence, and, while it is very apparent that there is much evidence to support appellant's theory of the case, there is also evidence to support the verdict of the jury. Unfortunately for appellant, a jury from his own county in whose selection he had a part indicated by their verdict that they were more impressed with the evidence of the witnesses for the commonwealth than by that offered in his behalf.

In view of the conflict in evidence, the challenge of its sufficiency to support the verdict in reality goes to the credibility of the witnesses, and it was peculiarly within the province of the jury to accept the evidence of one witness or set of witnesses to the exclusion of that of

others.  Wells v. Commonwealth, 195 Ky. 740, 243 S. W. 1015; Fannin v. Commonwealth, 200 Ky. 635, 255 S. W. 514; Alsept v. Commonwealth, 240 Ky. 395, 42 S. W. (2d) 517.  The verdict of a properly instructed jury should not be disturbed, unless palpably and flagrantly against the evidence.  Branham v. Commonwealth, 223 Ky. 233, 3 S. W. (2d) 629; Kirk v. Commonwealth, 192 Ky. 460, 233 S. W. 1060.

Finding no error in the record prejudicial to appellant's rights, the judgment is affirmed.