## Terrill v. Commonwealth.
Feb. 24, 1939.

J. BRACK HOWARD, Judge.

WILLIAMS & ALLEN and LEEBERN ALLEN for appellant.

HUBERT MEREDITH, Attorney General, and WM. F. NEILL, Assistant Attorney General, for the Commonwealth.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

Appellant and Richmond Graham were charged with murdering Arthur Tester on August 27, 1938. The indictment was returned on September 13, and trial was had on September 19, following. Motion for severance was sustained and the Commonwealth elected to try appellant. The trial resulted in a verdict of guilty and fixing penalty at twenty-one years confinement, the maximum for voluntary manslaughter. Judgment was entered upon the verdict; motion for new trial overruled, and appeal is prosecuted.

While the motion for a new trial was supported by seven or more grounds, we are asked to reverse the judgment because the verdict is flagrantly against the evidence, and because the court erred in:

(a) Admitting incompetent and prejudicial evidence against accused.

(b) Overruling appellant's motion to allow the jury to visit and view the scene of the homicide;

(c) Overruling appellant's motion to discharge the panel from which the jury was selected, because of irregularities in drawing the panel.

At the outset we may say that ground (a) is of such merit as to require a reversal. This will obviate the necessity of discussing at length other grounds, save the one charging that the verdict is flagrantly against the evidence.

Appellant admitted that he fired the shots which resulted in Tester's death, and claimed he did so to protect his life. Since he and his co-defendant were the only eyewitnesses, the facts may be better stated by first giving their version.

Appellant lived on Holly branch in Wolfe County. Deceased lived on Cave branch, a tributary of Holly branch, and Graham lived on Holly branch on the Moloney farm, all in the same general neighborhood, but some distance from each other. The homicide occurred about six-thirty in the afternoon. Earlier in the day appellant had started to the Moloney farm to see some live stock which Graham had said he was to take to the Winchester market, and which Terrill had indicated he might buy. We omit their movements until after appellant had gone home to advise his wife that he would be absent for a time and returned to the Moloney place and with Graham started to look at the live stock. Their proposed journey took them up Pence branch, and when appellant and Graham reached a point near the mouth of the branch, they met up with Tester and his wife, riding one horse, and on their way home. It appears (otherwise than from appellant's testimony) that Tester asked appellant for some liquor, and appellant displayed an empty bottle, declaring he had none, but that he and Graham were going up the branch to get a half-gallon, and Tester could then have "all he wanted."

It appears that Tester was willing to accompany them, but the wife seemed to demur. Appellant mildly insisted, though Graham advised him to let Tester "go home with his wife". Finally the wife got down from the horse, started toward her home; appellant, Graham and Tester, all riding, started in the opposite direction.

Resuming appellant's testimony, to some extent being corroborated by Graham, it was said that as they were riding along, Graham a few paces in front, appellant and deceased riding side by side, argument between the latter two arose. As they got near to the school house, Tester said to appellant: "This is the place you

gave Taylor Graham a pistol to kill me with." Appellant replied: "I did not," whereupon Tester said: "You are a G. D. liar." Graham interposed and tried to stop the argument, but Tester said: "By God I am not satisfied about this," and appellant replied: "Tester, I haven't got anything against you." Tester, according to the accused, had his right hand in his front pocket, and continuing the argument finally said, ".G. D. your heart, you ain't a friend to nobody"; drew his pistol and attempted to level it. Appellant knocked it down, drew his pistol and fired six shots, five of which took effect.

The two accused then rode away; they say that they went up Pence branch to the home of a neighbor to tell him what had happened, and to get aid for Tester. Not finding him at home they rode on to the home of Green Banks, and at the suggestion of appellant they went back to the point where Tester's body lay and found him dead, "in the road, his hands crossed, and his toes together". They were there about five minutes and left. Apparently they went back and located appellant, who later surrendered to officers.

It was claimed by appellant that Tester, on two not very remote occasions, had drawn his pistol and threatened to shoot appellant, which he said made him mad "just for a minute."

Graham, the other eyewitness, corroborates appellant in the main. He says after the shooting they went on up the road and met Bradley Haddix; appellant told him he had shot Tester, and asked Bradley to take Tester's horse home, which he did, and in doing so passed the point where the body of deceased lay in the road.

The testimony for the commonwealth was circumstantial, Tester's wife being the only witness testifying to facts just prior to the homicide. She and deceased, some time during the day, had gone up to Bethany school to take anti-typhoid shots, which the nurse administered about 5:30 p. m. They were homeward bound when they met up with Graham and Terrill, and she details what then happened, not differing materially from the testimony of the two accused. She says that when Terrill told Tester that they were going to get liquor, Tester said he couldn't go, as he had to go home and help with the milking; Terrill insisted on his

going, and offered deceased his pistol, saying: "Here you take my gun; you are the best friend I have got, and the only man I would let have my gun." Tester refused the proffer and told Terrill to put his gun up. Later Terrill said to his wife: "If you are afraid for him to go, you can go with him."

However, about this time the wife alighted from the horse and started homeward. She says he had been gone about seven minutes when she heard the shooting, but she walked on home, later learning that Terrill had shot her husband. She then got on a horse and went to a point near the home of Bradley Haddix and found her husband dead. She does not describe the position of the body. When she arrived several other persons were around the body. She says that Terrill seemed to be under the influence of liquor, and her husband sober, when they met.

On cross-examination she said that when they left to go to Bethany, her husband took with him his .38 caliber pistol, but when she went back to the scene she did not look for the pistol. It developed that her brother had gotten the pistol, returned it to her, and she had given it to some one else the next day.

Bradley Haddix lived near to the place where the homicide occurred. He and his eleven year old girl had been up to the milk-gap, finished milking and were returning home. They met Terrill and Graham riding away; Terrill told Haddix he had shot Tester, and asked him to take his horse home. About 200 yards from where he had met accused, he saw Tester's body lying in the road; "his feet were on the upper edge, and his head down the road, lying on his right side, his hands under him". He saw no sign of a pistol near the body. He left to tell Tester's wife and to obtain help. He informed the wife, then got on Tester's horse and went to the home of T. Little, nearly half a mile away, and witness and Little walked back to the scene. When they arrived they found Tester lying on his back with his arms stretched out, and a pistol under or near his right hand. The upper portions of his body and his hands were bloody. The pistol had no trace of blood on it. Haddix picked up the pistol; handed it to Little who "broke it" and found it loaded "all around". This evidence is of no importance, since neither appellant nor Graham claimed that Tester fired his pistol.

The eleven year old daughter of Haddix testified as her father had, with relation to what they had observed on their way home. She further said that when they got home her father told her to go to his brother's home, nearby, to bear the news to him. In so doing she went in the direction of the point where the dead man lay, but instead of following the branch road, followed a path up a hill. She says as she passed opposite the point where the body lay, she saw appellant and Graham standing over Tester's body. She was positive that she recognized them both. She says further that as she returned from her uncle's home, she saw the two riding away from the scene. The effect of this testimony is obvious—the inference being that the accused had returned to the scene, changed the position of the body, and advantageously placed Tester's weapon.

Appellant and Graham deny that they returned, or moved the body. It was testified that Graham and Banks had returned to the body at the instance of Terrill, but they denied that they had made any change in the position.

Bradley's wife had seen the three parties riding up the road just prior to the shooting. She was upstairs on her porch; Graham was riding a "step or two ahead" of Terrill and Tester, who were riding side by side, Terrill nearer to where she was standing. She heard Terrill say, in part, after the mention of Miles Hallon's name, "If it takes fighting or killing I will make something fly, aint I right?" and Tester answered: "Yes", and in a few moments she heard shots.

One witness testified, and was corroborated, that some one in the crowd around the body, and after dark, flashed a light from a lantern on a shiny object in the road a few feet from Tester's body, and in the direction which he had been riding. It developed that it was a tobacco can containing a brand of tobacco which deceased used. His wife said it was the same tin of tobacco which he had with him on the trip to Bethany, and she had seen him making cigarettes on the trip. There was also found near the can some cigarette paper. The tobacco can was powder burned. The inference is that Tester was in the act of making a cigarette, or drawing the can and paper from his pocket when Terrill began firing his pistol.

Examination of the body showed that there were

five shots which struck deceased, four of them going through the body. The wounds showed that most of them had entered Tester's right side, with indications that some had entered on the right side of his back. There was some evidence that Tester's reputation for peace and good behavior was bad, and some to the effect that Terrill was known as a fighter.

Shortly before the trial appellant and Graham went to the scene of the homicide for the purpose of ascertaining whether or not it was possible for the Haddix girl to have seen, from the point where she claimed to have been, persons standing in the road where Tester's body was found. King, the chief witness who had made the test, said that the party went to the home of Haddix, and he pointed out to them the place where the body was found; the point having been theretofore marked by a rail laid on the bank of the road. They placed Terrill and Graham at this point, and the little girl took them up the path to the point from which she had said she had seen the accused after the killing. The result of the test was, as testified, that one standing in the path on the bluff could see only the shoes and a short bit of the trousers of persons standing in the road. The distance between the two points was about 130 feet, and the bushes and undergrowth obstructed the view.

Haddix, testifying in rebuttal, said that after the testing party had gone, he and his wife went to the spot where the rail had been placed, and it had been removed about a "rail length" from its original position and was "headed up the creek". The court permitted Haddix to say that he had pointed out to several witnesses the place where the little girl had told him she was. These witnesses, two or three in number, testified that persons standing in the road were visible.

This testimony was met with objection, but the court permitted it to remain in with an admonition as to its effect and purpose. The evil here is that this testimony was hearsay. It is nowhere claimed that the little girl led this party to and pointed out the spot where she had made her observations, though it is said that she showed them the path she took in going to her uncle's home.

What Haddix told those who were making the test was based on what the little girl pointed out to her father as being the point from which she had said she

had observed the two accused. This character of testimony is not allowable. Louisville & N. R. Co. v. Murphy, 150 Ky. 176, 150 S. W. 79; Fidelity Deposit Co. of Md. v. Champion Ice Mfg. & Cold Storage Co., 133 Ky. 74, 117 S. W. 393, both cited with approval in Appalachian Stave Co. v. Pickard, 266 Ky. 565, 99 S. W. (2d) 472. In addition to error in admitting the testimony, the court further erred in his admonition to the jury in saying:

> "Gentlemen of the jury, you will accept the testimony of the witness leaving the chair for the purpose of contradicting and affecting witnesses who testified about the obstruction of the view from the path to the place where the body lay; not only for the purpose of contradicting, but for the purpose of corroborating the statements made by the little girl."

This was erroneous and prejudicial. The little girl's evidence was perhaps the most damaging in the whole case. This admonition not only permitted the jury to consider the testimony of the witness "leaving the chair" for the purpose of contradiction, but practically told them that it was corroborative of the little girl's testimony. If it tended to corroborate, it then became substantive evidence, and should have been introduced in the regular manner. It is difficult to see how anything could have been more prejudicial to the rights of the accused than to have the court say, in substance:

> "You will consider this evidence as contradictory of the testimony of those witnesses who have said that they could not see a person in the road from the point where the little girl said she saw them, and it corroborates the little girl's testimony."

Sullivan v. Com., 260 Ky. 471, 86 S. W. (2d) 135.

At this point we deem it proper to say that after a careful review of the testimony the court did not err in overruling a motion for a peremptory, or that the verdict is flagrantly against the evidence. We need not point specifically to any one or more bits of evidence in justification of our conclusion. A reading of such as we have related demonstrates sufficiently that the facts and circumstances were such that the jury might well have conceived the notion that there was ill feeling lingering in the mind of appellant, and he lured de-

ceased to a point where the act of taking his life might be consummated without adverse witnesses.

We have often ruled that when it is shown that accused committed the homicide, or admits that he fired the fatal shot, and undertakes to justify his act on the ground of self-defense, it is incumbent on him to establish such facts as will satisfy the jury that he was excusable in taking his adversary's life. He fails in this particular unless from all the evidence it be convincingly shown that the killing was in defense of life. Huff v. Com., 275 Ky. 578, 122 S. W. (2d) 143; Kirk v. Com., 247 Ky. 666, 57 S. W. (2d) 658; Reed v. Com., 273 Ky. 607, 117 S. W. (2d) 589, 116 A. L. R. 673; Privett v. Com., 271 Ky. 665, 113 S. W. (2d) 49.

We have also written that a verdict is not flagrantly against the evidence when it is reasonable to find from the facts and circumstances that accused committed the offense. The function of measuring the testimony and giving it due weight, under proper instructions, is the jury's. And when the evidence, though circumstantial, affords a fair and reasonable ground upon which the verdict might rest, we cannot overturn it. Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4; Duke v. Com., 191 Ky. 138, 229 S. W. 122.

Our conclusions obviate the necessity of discussing other questions at length. We express the opinion that the court correctly overruled appellant's motion to discharge the jury, for two reasons: It appears from the proof that the irregularities charged were cured by the court's action in reassembling the commissioners and refilling the jury wheel, and from which the panel tendered to appellant was drawn; again as we closely scrutinize the record, his motion came too late.

We think the court acted clearly within, and did not abuse, his discretion when he overruled appellant's motion to view the scene.

These points, perhaps, will not be raised on another trial; certainly the first one should not, nor should there arise the embarrassing situation of the repudiation of certain evidence by a witness who testified and repudiated his testimony after the trial was had.

On the ground that the testimony specifically mentioned and admitted in rebuttal was incompetent, and

the admonition to the jury thereon was improper, the judgment is reversed with directions to grant appellant a new trial.