# Crawford et al. v. Commonwealth.

Feb. 2, 1940.

558

Luker & Begley, A. T. W. Manning and F. P. Stivers for appellants.

Hubert Meredith, Attorney General, W. Owen Keller, Assistant Attorney General, Roy W. House, John Asher and S. V. Little, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY SIMS, COMMISSIONER—— Affirming.

James Crawford, Ted Jewell and George Hensley were jointly indicted by the grand jury of Clay County for the wilful murder of Mahan Hoskins. There was some doubt in the mind of the commonwealth attorney as to whether or not a fair and impartial trial could be had in Clay County. Thereupon it was agreed between the commonwealth and the defendants that grounds for a change of venue existed and the court ordered the case transferred to Laurel County for trial. Com. v. Kelly, 266 Ky. 662, 99 S. W. (2d) 774. The trial resulted in a conviction of all the defendants, of manslaughter, the jury fixing the punishment of Crawford at confinement in the penitentiary for 21 years, and that of the other defendants at 2 years each. The defendants rely upon the following errors for a reversal of the judgment: (1) The verdict is flagrantly against the evidence; (2) the court failed to instruct on the whole law of the case; (3) admission of incompetent and irrelevant evidence; (4) improper argument by the commonwealth attorney.

Crawford owned a farm in Clay County on Bowling branch upon which he resided with his wife and eleven children. Jewell and Hensley had married daughters of Crawford. Jewell's home was some 300 yards from that of his father-in-law, while Hensley lived about three miles from Crawford. Bob Sizemore's farm adjoined Crawford's, with the Sizemore residence located some 300 yards down Bowling branch from the Crawford resi-

dence. Sizemore's tenant, Mahan Hoskins, lived beyond the Crawford home and Mahan in traveling from his home to that of Sizemore passed by the Crawford home if he traveled the county road, or he could travel a path through the fields and not pass by the Crawford home.

Sizemore's son, Craft, a man 23 years of age, and Mahan had some trouble with Crawford and Hensley and were accused of shooting at the latter. An examining trial on this shooting charge was held in Manchester on Saturday, March 17, 1938, at which an effort appears to have been made to put some, or all, of the parties engaged in that difficulty under a peace bond. That afternoon while returning from this trial, the Sizemores and Mahan, who were traveling by automobile, met at Farmer Hoskins' store a wagon in which were traveling Crawford and his two sons-in-law, all of whom were accompanied by their wives and a child or so. The evidence is in sharp conflict as to what happened there. The Sizemores and Mahan testified Crawford and his sons-in-law threatened them. The latter denied this and testified the Sizemores and Mahan threatened them with drawn pistols. No encounter occurred at the store and the Crawford wagon proceeded homeward, and as Crawford's home was up the branch from the Sizemore home, it was necessary to drive the wagon by the latter. After going a short distance from the store, the occupants of the wagon saw the Sizemores, Mahan and others on foot cutting across the fields in their direction. This alarmed Hensley, who left the wagon and started walking over the mountain. Shortly thereafter Crawford and Jewell likewise left the wagon and took a short cut over the mountain on foot to the Crawford home, leaving the women to drive the wagon.

The three defendants reached the Crawford home some few minutes before the wagon, and as soon as it arrived they started unhitching the team. About the time the mules were unhitched, the women reported to the men that the Sizemores, Mahan and several other persons, all of whom were armed, were approaching the Crawford home. The defendant Crawford, who had a pistol in his pocket, immediately went to the house, some 35 yards from his barn, got his 12 gauge single-barrel shot gun and some shells loaded with buck shot and returned to his barn, which was some 8 or 10 feet from the county road.

The Sizemores' version of the shooting was that

Craft and Frank Sizemore started with Mahan to his home about 5:30 in the afternoon, traveling the county road. Craft was unarmed and carried a cross-cut saw, while Mahan had an unloaded shot gun on his shoulder and a pistol in his pocket. Craft and Mahan were walking abreast with Frank, who was a 12 year old boy, following a little to the rear of his brother, Craft. It was testified that they were going to cut some wood before night; that they anticipated no trouble and that the gun was taken by Mahan for the purpose of hunting. That just as they got a little beyond the barn three shots were fired from it without warning; that these shots were almost simultaneous, with Crawford shooting a pistol and the other two defendants shooting shot guns. Mahan was shot in his right shoulder, ran up a hill about 30 or 40 yards and fell behind a little bank. The boy Frank ran and was unhurt, while Craft, who was not wounded, jumped into a ditch, and after the first fussilade ran to Mahan, took a pistol from Mahan's holster and emptied the contents of the pistol into the barn. At this time Hensley ran out of the back of the barn and departed from the scene of trouble.

John Napier and Irvin Davidson were at Bob Sizemore's home for the alleged purpose of buying hogs and when this shooting started Bob ran from his hog lot to this house and obtained three guns; a British 303 rifle which he kept, a 30-30 rifle which he handed Napier and an automatic shot gun which he gave Davidson. Bob Sizemore testified he ran to a hickory tree in his hog lot, which was about 50 feet from Crawford's home, and shot into the house with his high powered rifle; that after Craft had emptied the contents of Mahan's pistol into the barn, he ran to the hickory tree where his father was, obtained the 30-30 rifle from Davidson and told his father the shots were coming from the barn. Bob and Craft then directed their fire into the barn. Napier and Davidson deny firing a shot.

All three of the defendants testified the shooting occurred in the following manner. Just as the mules were turned into the stable, Craft Sizemore, armed with a pistol, and Mahan, armed with a shot gun and a pistol, were walking rapidly up the county road, followed by the boy, Frank. Just as they got opposite the barn, Bob Sizemore and Bob Campbell, both armed, appeared at a hickory tree in Bob's hog lot, which was about 100 yards from Crawford's barn and 50 yards from his house, and

Bob called hogs a couple of times. Immediately after the hog call was given, which defendants infer was a signal, Mahan walked up to the fence at the barn, saying, "Come out of there, you coward son-of-a-bitch, I came to fill that peace bond you asked me to fill today," and fired his pistol at Crawford just as Crawford went into the barn. After Crawford got into the barn Mahan fired a second pistol shot at him and Crawford, through a crack in the barn, returned the fire with his shot gun, but did not hit Mahan. Crawford then ran to another crack in the barn, where he could see better and as Mahan was looking for him, he fired his shot gun a second time which inflicted the fatal wound in Mahan's right shoulder. When the shooting started Hensley ran out the far end of the barn, departing the scene of combat, and Jewell sought safety in a feed trough. All three defendants testified none of them did any shooting except Crawford. When the shooting started at the barn, the men at the hickory tree riddled Crawford's house with gun fire, but it was unoccupied as the women and children left the premises as soon as it was reported that armed men were approaching.

We could detail much evidence offered for defendants that several pistol shots were heard before any shot gun was fired, and we could relate just as much evidence offered by the commonwealth that the first shooting consisted of three shots, fired practically simultaneously, two from a pistol and one from a shot gun. We do not deem it necessary to detail the evidence any further because that offered by the commonwealth is in direct conflict with that offered by the defendants. If the commonwealth's evidence is to be accepted, Mahan was waylaid and assassinated from Crawford's barn. While, if defendants' evidence is to be believed, none of them were armed except Crawford, and none of them did any shooting except Crawford, and he fired in self-defense after Mahan had first shot at him two times with a pistol.

Here the evidence was in direct conflict, hence it was for the jury to determine the credibility of the witnesses and the weight of the evidence. The jury is not bound to accept in toto the commonwealth's evidence, nor that offered by the defendants. It may accept the testimony of certain witnesses and exclude that of other witnesses, or it may accept such portion of a witness's testimony it regards as reasonable and reject that which

it believes to be inaccurate or unreasonable. The law imposes upon the jury the duty of finding the true facts on conflicting evidence, and we cannot say the verdict is flagrantly against the evidence when it was reasonable for the jury to find from the proven facts and circumstances that the defendants committed the offense charged in the indictment. In the instant case there was abundant evidence to support the verdict and we cannot disturb it as being flagrantly against the evidence, Shepherd v. Com., 236 Ky. 290, 33 S. W. (2d) 4; Terrill v. Com., 277 Ky. 155, 125 S. W. (2d) 1015; Carter v. Com., 278 Ky. 14, 128 S. W. (2d) 214.

Defendants contend the court's instructions did not give all the law of the case and that they were entitled to an instruction embodying the defense of home. In criminal cases the instructions are based upon the evidence and must be given to fit the case under trial. Payne v. Com., 255 Ky. 533, 75 S. W. (2d) 14. Here there was no evidence offered on behalf of any of the defendants that they were acting in the defense of their home—their testimony was that Crawford fired all the shots, and that he did so in self-defense. The facts in the instant case are quite different from those in the case relied on by defendants of Burks v. Com., 254 Ky. 193, 71 S. W. (2d) 418, where a house occupied by the defendant and his family was fired into by the deceased, or some of his companions, and the killing was done when defendant returned the fire from his home. We are of the opinion that where the home was unoccupied at the time of the tragedy and the plea of defendants was self-defense, there should be no instruction given on the defense of home even though an associate of deceased shot into the home under the mistaken belief defendants were shooting from it. Hatfield v. Com., 264 Ky. 721, 95 S. W. (2d) 562; Ponton v. Com., 269 Ky. 614, 108 S. W. (2d) 535.

Also, defendants complain the instructions should have expressly told the jury, that they were not obliged to retreat after the attack made by Mahan and that they had the right to stand their ground and to defend themselves, citing Holloway v. Com., 74 Ky. 344. The self-defense instruction in the Holloway case was to the effect that if Holloway had reason to believe that he was in danger of death, or great bodily harm, at the hands of his antagonist *"and that his only means of securing safety"* was to shoot deceased, he should be acquitted on

the ground of self-defense. In criticising this instruction the court said that the jury should have been told that the defendant did not have to retreat, but had the right to stand his ground and defend himself. The error in the instruction in the Holloway case was that it limited defendant's right to kill in self-defense to a situation where there was no other means of securing safety, and it might reasonably be inferred from such instruction that the defendant would have had to "retreat to the wall" before he could kill in self-defense. The instruction in the instant case follows the self-defense instruction set out in Hobson, Blain & Caldwell, Instructions to Juries, 890 Section 742, which has been approved many times by this court. The instruction in the instant case did not require the defendants to retreat and allowed them to defend themselves even to the extent of killing Mahan, if in their judgment it was reasonably necessary to do so in order to avert the danger, real, or to the defendants apparent. The same modification of the self-defense instruction asked for here was requested in Connor v. Com., 118 Ky. 497, 81 S. W. 259, and we said the trial court in that case properly refused to modify it. The Connor case has been followed in Caudill v. Com., 234 Ky. 142, 27 S. W. (2d) 705, and Hall v. Com., 243 Ky. 507, 49 S. W. (2d) 321.

We are not impressed with defendants' exception to the commonwealth's evidence that Crawford purchased a pint of whiskey two hours or more before the shooting and that his wife, who was traveling in the wagon with him and the two sons-in-law, purchased a half pint of whiskey. There was some evidence introduced by the commonwealth that all the defendants were drunk at Farmer Hoskins' store, which could not have been over an hour before the tragedy, hence, it was competent to prove that whiskey was bought by, and in the possession of, the occupants of the Crawford wagon.

Defendants argue the court erred in permitting the commonwealth to introduce the coat worn by Mahan at the time he was killed, contending it was not in the same condition when introduced in evidence as it was on the day of the killing. Bob Sizemore testified the coat was in the same condition with the exception that the doctor attending Mahan had cut it off of him. Where clothes have to be cut off of a person and such cutting does not affect the part of the garment to which the jury's attention is to be directed, we have held that such sever-

ance of the garment does not so change its condition as to prevent it from·being introduced in evidence. Mann v. Com., 226 Ky. 296, 10 S. W. (2d) 1094.

At the conclusion of defendants' evidence the court permitted the commonwealth to prove Crawford's general reputation for morality was bad. The court admonished the jury such evidence could only be considered as affecting his credibility as a witness. Defendants contend that Crawford's reputation could not be attacked until after he put it in issue by proving his good reputation. Section 597, Civil Code of Practice (which also applies in criminal cases), provides a witness may be impeached by proof that his general reputation for morality is bad. When defendant testified, he put in issue his reputation for veracity and the court did not err in allowing the commonwealth to prove his general reputation for morality, Loving v. Com., 209 Ky. 536, 273 S. W. 56.

There were many other exceptions taken by defendants to the commonwealth's evidence, but it would extend this opinion to great length if we discussed them all. It will suffice to say that a careful examination shows them to be without merit, and we have discussed those we thought worthy of note.

The improper argument complained of was a personal attack the commonwealth attorney made upon one of the attorneys for the defendant concerning a political race he was alleged to have made, and concerning other matters of an entirely personal nature. The court admonished the jury not to consider such an argument. While the argument was wholly improper and should not have been tolerated by the court, it could not have been prejudicial to the substantial rights of the defendants since it was purely a personal attack by the commonwealth attorney on one of the counsel for the defendants, and had no reference whatever to the defendants, or to the case under trial.

Finding no errors in the record which are prejudicial to the substantial rights of the defendants, the judgment is affirmed.