# Mills et al. v. Commonwealth.

Nov. 10, 1944.

A. T. W. Manning for appellants.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

Greenberry Mills, Clarence and Tom Jordan were jointly indicted for the murder of Albert Smith. Upon their trial Tom was acquitted, while Greenberry and Clarence were convicted of manslaughter and given five years in the penitentiary. In their motion for a new trial they assigned five errors, but here only one of them is argued in their brief, that the verdict is flagrantly against the evidence.

The three defendants lived in the same neighborhood. Tom's home was between Greenberry's and Clarence's, being about 500 yards from the former and some 300 or 400 yards from the latter. Tom was 83 years old and is the father of Clarence. Greenberry and Tom, with members of their family, had gathered at Clarence's home for dinner on Christmas Day in 1943. Earlier in the day Lon Edwards entered Clarence's home intoxicated and had a .45 caliber pistol which Clarence took from him and required Lon to leave.

Tommy Mills, who is a son of Greenberry, a grandson of Tom, and a nephew of Clarence, had married a daughter of Colonel May and appears to have been living in the May home, although the record does not definitely show this fact. The pistol Clarence had taken from Edwards belonged to May, who requested Tommy to go to Clarence's home and recover it. Mounted on May's mare, Tommy started for Clarence's home. On the way he stopped at Farmer Mills where he took a drink or so with Albert Smith and invited the latter to accompany him.

Smith, riding a mule bare-back, and Tommy riding the mare went to Clarence's home and without dismounting called Clarence and Tommy's father out of the house. Clarence came out with the .45 pistol and Greenberry brought his shotgun with him to the road. The testimony is in sharp conflict as to what happened at the meeting in the road in front of Clarence's home.

Tommy, testifying for the Commonwealth against his father, grandfather and uncle, stated that when he asked Clarence to deliver May's pistol to him, Clarence replied with an oath that he would not give up the pistol until "the law" made him; that Albert caused no disturbance and did not attempt to draw his pistol; that when Clarence refused to give him the pistol, he and Albert rode off and after proceeding 75 or 100 yards Clarence and Greenberry started shooting at them and they put their mounts in a run and did not return the fire.

Greenberry's testimony was that while he was talking to Albert the latter kept trying to draw his pistol and he asked him to stop, saying they were friends and he did not want any trouble but that he would kill Albert if he drew his pistol. Both Greenberry and Clarence testified that Albert and Tommy rode off with

their mounts in a run and after going about 30 yards Albert twisted his body on the mule and with his left hand emptied his pistol at them while the mule continued to run; and Clarence returned the fire with his pistol. Greenberry testified he did not fire the shotgun, but Tommy's testimony was that both the pistol and shotgun were fired at them while they fled. No one was wounded in this first shooting.

Tommy further testified that after traveling about 300 yards, Albert's mule went lame and as they were out of sight of the defendants, they stopped in the road near Tom's Barn. That he and Albert remained there in the road four or five minutes; that he dismounted and was fixing a stirrup-strap on his saddle when defendants appeared and all three of them opened fire on Albert, who was still astride the mule with his pistol in a holster, shooting him in the head. That Albert fell off the mule in the road 9 or 10 steps from a beech tree and died immediately. That his father (Greenberry) then threw his gun on him (Tommy), and with an oath threatened to kill him; and he (Tommy) got on his mare and rode away.

Tom Swafford helped load the body on a sled that night and testified it was found 6 or 8 feet "out of the road" and some 10 or 12 feet from a beech tree, lying on beech roots, dry leaves and black dirt, while yellow mud made the road; that there was a pool of blood in the edge of the road. There was testimony to the effect that deceased's clothing had yellow mud on it.

Again, there is direct conflict in the evidence. The three defendants testified they remained in Clarence's home from 15 to 45 minutes after the horsemen departed. Then Clarence went home with his father to help Tom feed and Greenberry took his gun and accompanied them, as it was on his way home. When they reached Tom's house, Clarence went in and got his father's shotgun, fearing Albert and Tommy might return while he was feeding. On the way to the barn defendants saw the horse and mule hitched in a flat some distance from the road with the two riders behind a beech tree some 6 feet from the bank of the road and about 60 yards from defendants. Albert opened fire with his pistol on Clarence, who returned it with the shotgun, then slipped and fell, accidentally discharging his gun. None of these shots took effect.

Greenberry testified that he advanced towards the tree calling to the boys to stop shooting; that when he was within about 20 feet of the tree Albert stuck his head around the left side of it, shot at him and missed, and he shot Albert in the left eye which killed him immediately. He denied that he then threatened to kill Tommy. All defendants testified that Tom was not armed, took no part in the shooting and was at his barn watering a calf.

There was no mud around the beech tree and defendants account for the mud on deceased's clothing by the fact that he was muddy when he appeared at Clarence's house and that he there stated he had fallen off his mule several times. There were marks on the beech tree showing it had been hit by balls from a pistol as well as shot from a gun. The pistol marks were 5 or 6 feet high on the tree, while the gun marks were from 3 to 3½ feet high. Deceased's pistol lay between his legs and it contained 3 or 4 empty cartridges and 2 which had not been fired.

It is apparent from the punishment inflicted that the jury did not accept in full either the evidence of the Commonwealth or that of the defense. Had it accepted in toto the evidence of defendants, they should have been acquitted since they established a clear case of self-defense. On the other hand, had the jury accepted in full the evidence of the Commonwealth, it could have done nothing but find all three of the accused guilty of wilful murder.

The physical facts so confidently relied upon by defendants as establishing self-defense are not immutable facts, but are such as to have justified the jury in believing they could have been created by defendants. The jury could reasonably have inferred from the evidence that Albert was shot in the road and carried to the beech tree, and that the shot-marks on the tree had been made at another time.

The duty of finding the true facts on conflicting testimony is imposed upon the jury by the law. In its discretion the jury may accept part of a witness's testimony and reject the other part, or it may accept all or reject all. The credibility of the witnesses and the weight to be given their evidence rests in the discretion of the jury. The mere fact that the witnesses testifying for the defense outnumber those for the Common-

wealth does not signify that the convicting verdict is flagrantly against the evidence. Gillenwater v. Com., 291 Ky. 493, 165 S. W. 2d 35. No verdict can be said to be flagrantly against the evidence when it is reasonable for the jury to find from the facts and circumstances that defendants had committed the crime with which they stand charged. There is abundant evidence to support the verdict against these two defendants and we cannot disturb it as being flagrantly against the evidence. Crawford v. Com., 281 Ky. 557, 136 S. W. 2d 754, and authorities therein cited.

The testimony in this case covers 318 pages, the first 180 of which are written with such a dim ribbon that it gives a blurred effect and is trying on the eyes to read. This violates rule 3, subsection 2, of this Court, and the stenographer who made the transcript of this testimony will have $10 deducted from her fee for violating this rule and same will be refunded to defendants. The trial court will cause this refund to be made by proper order upon the filing of the mandate.

The judgment is affirmed.